[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12529

_____

D.C. Docket No. 5:12-cv-00209-LJA

DAVID CARTER,
CLAYTON GRAHAM, JR.,
MITCHELL WEBSTER,

                                                Plaintiffs - Appellees,

versus

BUTTS COUNTY, GEORGIA, *et al.*,

                                                Defendants,

TIMOTHY FILBECK,
Individually and in his Official Capacity,

                                                Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(May 3, 2016)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and GOLDBERG,[*] District Judge.

ROSENBAUM, Circuit Judge:

Defendant-Appellant Timothy Filbeck was a lieutenant with the Butts County Sheriff's Office. When his house was foreclosed upon, he, like anyone else who has been through foreclosure, had certain options available to him. But arresting the new owner's agents, Plaintiffs-Appellees David Carter, Clayton Graham, Jr., and Mitchell Webster (collectively, "Plaintiffs"), who were lawfully performing their jobs, was not one of them. And neither was ordering Plaintiffs handcuffed and thrown in jail overnight. We think that should go without saying. Yet Filbeck did these things, anyway. Now Filbeck tries to convince us that he is immune from suit. We are not persuaded. Being a law-enforcement officer is not a license to break the law. And it is certainly not a shield behind which Filbeck may abuse his power with impunity.

**I.**

Filbeck worked as a deputy sheriff with the Butts County Sheriff's Office. In the Spring of 2005, he and his wife bought a home (the "Property") for themselves. In connection with the purchase, Filbeck executed a Security Deed, which authorized the mortgage owner to enter the property to protect its interests if

---

[*] Honorable Richard W. Goldberg, United States Court of International Trade, sitting by designation.

Filbeck abandoned the Property.[1]  At the time relevant to this appeal, Ocwen Loan Servicing LLC ("Ocwen") was the mortgage holder with respect to the Property.

In July 2010, the Filbecks fell behind on their mortgage and defaulted on the loan.  Ocwen notified the Filbecks of their default and informed them that it was opting to accelerate their loan, causing the entire amount of the outstanding balance of the mortgage to become due.  In addition, Ocwen advised the Filbecks that it intended to sell the Property at a foreclosure sale.  In September 2010, Ocwen initiated foreclosure proceedings on the Property.

By letters dated September 22, 2010, and November 22, 2010, Ocwen notified the Filbecks of the impending foreclosure.  Attached to the letters were Notices of Sale, which stated that the Property was scheduled to be sold on the first Tuesday in January 2011.  Ocwen arranged for these Notices of Sale to be published in the local paper in December 2010.  Filbeck acknowledged that he received the letters and saw the Notices.

In response to the foreclosure proceedings, in early November 2010, the Filbecks moved out of the Property and into a family member's home.  They ate,

---

[1] The Security Deed provided,

> If . . . (c) Borrower has abandoned the Property, then the Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property . . . including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). . . . Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building violations or dangerous conditions.

slept, and began receiving mail there.  In November 2010, all utilities (electric, water, and sewer) on the Property had been turned off.  Ultimately, the Property was foreclosed upon on January 4, 2011, and conveyed to U.S. Bank National Association, by and through Ocwen, its duly appointed attorney-in-fact.  Nothing in the record suggests that the Filbecks ever sought to challenge the foreclosure.  But Filbeck claims that he was unaware that the foreclosure proceedings had been finalized.

In the meantime, in mid-December 2010, Altisource Portfolio Solutions ("Altisource"), Ocwen's agent and property manager, contracted with MD Maintenance, LLC ("MDM"), to prepare the Property for resale.  Danny and Tina Carter,[2] who own MDM, explained that their standard procedure for preparing a foreclosed home for resale includes first determining whether the home is still occupied or whether, instead, it has been abandoned.  If the home is still occupied, MDM notifies Altisource, which then initiates eviction proceedings.  But if the home has been abandoned, MDM enters the home, changes the locks, takes pictures, cleans out the home, and repairs any damage.  MDM also places signs on the home that state that the property is under the supervision of Ocwen, note that MDM is the authorized representative of Ocwen, and provide contact information

---

[2] Because Plaintiff David shares the last name "Carter" with Danny and Tina Carter, as well as with Greg Carter, another witness in the case, we refer to the Carters by their first names to avoid confusion.

4

for MDM in case a reader needs to access the property or report a problem (the "MDM Notice"). MDM followed this standard procedure with respect to the Filbecks' home.

Between December 12, 2010, and January 15, 2011, MDM's representatives visited the Property about four times to verify that no one resided in the home. Although MDM found some personal items left by the Filbecks, it found no one living at the Property. The heat and electricity were turned off, and "cobwebs [extended] from wall to wall in almost every room." MDM established that the utilities on the Property had been discontinued in November 2010. Tina also personally spoke with a neighbor of the Filbecks who confirmed that no one was living at the Property. Against this background, MDM concluded that the Property had been abandoned.

Around January 18, 2011, Danny and other MDM employees arrived at the Property to begin preparing it for resale. During the visit, the men posted the MDM Notice on the front door. One of the men took a picture of the MDM Notice and sent it to Altisource. Eleven days later, when Graham, along with other MDM employees, returned to the Property to continue cleaning it out, the MDM Notice was still affixed to the front door.

The following day, Filbeck visited the Property and discovered that some of his personal property was missing. Although the MDM Notice was still affixed to

5

the front door, Filbeck did not contact anyone at Ocwen, Altisource, or MDM regarding their entry into the home or the removal of any property.[3]

Instead, Filbeck boarded up the windows, nailed the doors shut, and placed four signs reading "KEEP OUT" on the Property. Filbeck also prepared and filed a police report using fellow deputy Kenneth Mundy's name[4] and submitted a claim to Liberty Mutual Insurance for the missing property.[5] When Mundy later discovered the police report, he demanded that his name be removed from it and insisted that he had not prepared it, authorized it, or known anything about it at the time that it was submitted.

On January 31, 2011, Graham and Greg returned to the Property to continue their maintenance efforts. When they arrived, they discovered that the windows had been boarded, the doors nailed shut, and the MDM Notice had been removed and replaced by the "KEEP OUT" signs. Greg reported the circumstances to Tina, who, in turn, called Altisource to confirm that the Property had been foreclosed upon and that MDM was authorized to be there. Altisource assured her that

---

[3] Filbeck contended that he never saw the notices affixed to the front door of the Property. But Filbeck admitted to Tina that he had seen the MDM Notice posted on the Property. According to Tina, Filbeck said that he tore down the MDM Notice and that it was not worth "shit." Graham similarly attested that Filbeck admitted in his presence to ripping the Notice off the Property. Since we are reviewing Filbeck's motion for summary judgment, we construe the facts in the light most favorable to Plaintiffs and accept the statements of Tina and Graham. *See Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1326-27 (11th Cir. 2006).

[4] Filbeck told Mundy that he did not "feel right" taking the report on his own home and thought it was alright for him to make the report in Mundy's name.

[5] Liberty Mutual subsequently made a $7,785.11 payment to satisfy the claim.

6

everything was proper but suggested that she call the police to inform them of what had occurred.

So Tina called the Butts County Sheriff's Office, explained the situation to the dispatcher, and requested that an officer visit the Property. Officer Thomas Middleton arrived with another officer, and Greg explained to them that the Property had been foreclosed upon by Ocwen, who, in turn, had hired MDM to prepare the Property for resale. After Middleton looked around the Property and concluded that no one was living there, he left the Property without incident.

Later, Middleton told Filbeck about his visit to the Property. In the course of their conversation, Middleton informed Filbeck that he had seen paperwork that appeared to authorize the entry into and cleaning out of the Property. A few weeks later, on the morning of February 22, 2011, Plaintiffs went to the Property. The "KEEP OUT" signs were still there. Because the doors remained nailed shut, Graham and Webster entered the Property through a bathroom window. They began removing items from the home and placing them on MDM's trailer, which was parked on the Property.

While Plaintiffs were working, Filbeck learned they were there and caused Lieutenant Matthew Vaughan to go to the Property and confront them.[6] When

---

[6] Mundy received a phone call from his father-in-law, who happened to live two houses away from the Property. Apparently, Filbeck had asked Mundy's father-in-law to let him know if anyone showed up at the house. When Mundy's father-in-law saw the men cleaning out the

7

Vaughan arrived, Plaintiffs told him that they were cleaning out a "foreclosure home." David Carter gave Vaughan and other deputies who joined Vaughan on the scene, documentation showing that the Property had been foreclosed upon and that Plaintiffs were legally authorized to work there. The documentation also instructed anyone with questions to contact Altisource at a provided phone number.

Meanwhile, Filbeck arrived on the scene and assumed control of the investigation. Upon Filbeck's arrival, Vaughn handed him a piece of documentation.[7] David also attempted to show Filbeck an authorization letter on his phone, but Filbeck refused to review it and retorted that the authorization letter "and the rest of this paperwork don't [sic] mean a damn thing." Filbeck appeared to be extremely angry, and he cursed and shouted at Plaintiffs.

In an effort to resolve the situation, David called Tina and asked her to speak with Filbeck. Although Tina tried to explain to Filbeck why MDM was at the Property, Filbeck refused to listen. Instead, Filbeck insisted that he owned the house, that MDM had no right to be there, and that the foreclosure was "illegal." He also rejected Plaintiffs' documentation and the MDM Notices posted at the

---

Property, he called Mundy and told him that men had returned. Mundy relayed the information to Filbeck, who then instructed him to call Vaughan, the patrol commander. Vaughan responded to the call.

[7] Vaughan testified that he "may have" handed Filbeck a document that he had obtained from the Plaintiffs. Mundy testified that he saw Vaughan provide Filbeck with a letter.

Property, characterizing them as not worth "shit." Finally, despite Tina's continuing attempts to reason with Filbeck, Filbeck rejoined, "Your boys are going to jail and are staying there until I get my stuff back." He also threatened to arrest Tina.[8]

When Filbeck finished with Tina, he contacted the Clerk of Superior Court of Butts County to ask whether any eviction notices had been filed or were pending on the Property. He made the same inquiry of the Butts County Sheriff's Office Warrants and Civil Papers Division. After both agencies told Filbeck that no eviction notices had been filed, Filbeck ordered the arrests of Carter, Graham, and Webster for burglary.

The officers handcuffed and took Plaintiffs to the Butts County Detention Center. There, they remained incarcerated for roughly 24 hours before they were released without any charges filed.

When the officers carted Plaintiffs off to jail, the Butts County Sheriff's Office confiscated two cameras, silverware, and $20.00 in cash. MDM had used the cameras to take pictures of the Property.

Filbeck later admitted that he had accessed MDM's impounded vehicle, retrieved a camera, and downloaded pictures onto his computer without a warrant

---

[8] Though Filbeck claims that he never spoke with Tina on February 22, his own colleague, Mundy, contradicted him.

or authorization while the men were stuck in jail.  The cameras, silverware, and $20.00 in cash were never returned, despite demands for return of the property.

## II.

Plaintiffs filed suit against Filbeck and Butts County Sheriff Gene Pope, individually and in their official capacities.  They also sued Butts County, Georgia. In their complaint, Plaintiffs asserted a claim, against all Defendants, under 42 U.S.C. § 1983 for violation of Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.  Besides the § 1983 claim, Plaintiffs alleged conversion against all Defendants.  Against just Pope and Butts County, Plaintiffs averred causes of action for negligent hiring and retention and for ratification.

Defendants moved for summary judgment on all claims.  With respect to the § 1983 claim, Filbeck asserted qualified immunity.  The district court denied summary judgment on the § 1983 claim against Filbeck, finding that he was not entitled to qualified immunity.  It also denied summary judgment for all Defendants on the conversion claim.  As for all remaining claims, the district court granted summary judgment.

Defendants now appeal all adverse summary-judgment rulings against them.

## III.

We review *de novo* a district court's denial of a motion for summary judgment on qualified immunity grounds.  *Fils v. City of Aventura*, 647 F.3d 1272,

1287 (11th Cir. 2011). Summary judgment is appropriate only when the moving party demonstrates that no disputed issue of material fact exists. *Id.* At this stage, the Court "accept[s] the Plaintiffs' version of the facts and draw[s] all justifiable inferences in their favor." *Id.* (citation omitted). The Court does not make credibility determinations or choose between conflicting testimony. *Bozeman v. Orum*, 422 F.3d 1265, 1267-68 (11th Cir. 2005) (per curiam). Instead, this Court "resolve[s] all issues of material fact in favor of the plaintiff, and then determine[s] the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Bashir*, 445 F.3d at 1326-27. In making a qualified immunity determination, this Court similarly reviews the facts in the light most favorable to the Plaintiffs. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

## IV.

### A. § 1983 Claim

We begin our review with the district court's denial of qualified immunity for Filbeck. Qualified immunity protects police officers from suit in their individual capacities for discretionary actions performed in the course of their duties. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). It serves the purpose of allowing "government officials to carry out their discretionary

11

duties without the fear of personal liability or harassing litigation." *Durruthy v. Pastor*, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted).  Under qualified immunity, "all but the plainly incompetent or one who is knowingly violating the federal law" are shielded from litigation.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  Qualified immunity "does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting *Harlow*, 457 U.S. at 815, 102 S. Ct. at 2737 (internal quotation marks omitted) (alteration provided by *Holmes*)).

An official like Filbeck, who asserts entitlement to qualified immunity, must first establish that he was acting within the scope of his discretionary authority. Once he shows that, the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate.  *Lee*, 284 F.3d at 1194.  Overcoming the official's qualified-immunity defense requires a plaintiff to establish both that the officer's conduct violated a constitutionally protected right and that the right was clearly established at the time of the misconduct.  *Pearson*, 555 U.S. at 232, 129 S. Ct. at 816; *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010).  We may consider whether the plaintiff has satisfied his burden in any order.  *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818.

12

Here, the parties agree that Filbeck was acting within the scope of his discretionary authority as a police officer at the time of the incident. So we turn to whether Plaintiffs showed that Filbeck violated Plaintiffs' constitutional rights when he arrested them and whether those rights were clearly established at the time of the arrests.

The parties do not quarrel over the applicable law. Where an officer orders the arrest of an individual, he may be liable for a Fourth Amendment violation. *See Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007). The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest is a seizure, and we assess the reasonableness of an arrest by the presence of probable cause for the arrest. *Skop*, 485 F.3d at 1137. By now it is well established that "[a] warrantless arrest without probable cause violates the Fourth Amendment and forms a basis for a section 1983 claim." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). But where probable cause supports an arrest, it acts as "an absolute bar to a section 1983 action for false arrest." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (citation omitted).

Probable cause to arrest exists if "the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would

13

cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal quotation marks and citation omitted). We assess probable cause based on the "totality of the circumstances." *Id.*; *Skop*, 485 F.3d at 1137.

If an officer lacked probable cause to arrest, we must consider whether *arguable* probable cause supported the arrest at the time. *See Case v. Eslinger*, 555 F.3d 1317, 1326-27 (11th Cir. 2009). If so, the officer is still entitled to qualified immunity, even in the absence of actual probable cause. *Id.* (citing *Lee*, 284 F.3d at 1195); *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001) (per curiam). As the Supreme Court has explained, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials . . . should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 107 S. Ct. 3034, 3039-40 (1987).

An officer has arguable probable cause to arrest "where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Id.* (citations and internal quotation marks omitted). To determine whether an officer had arguable probable cause, we ask "'whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation.'" *Lee*, 284 F.3d at

1195 (quoting *Vaughan v. Cox,* 264 F.3d 1027, 1036 (11th Cir. 2001)).   This standard does not shield officers who unreasonably conclude that probable cause exists.  *Skop*, 485 F.3d at 1137.  Where an officer arrests without even arguable probable cause, he violates the arrestee's clearly established Fourth Amendment right to be free from unreasonable seizures.  *See Case*, 555 F.3d at 1327 (11th Cir. 2009).

In evaluating whether arguable probable cause supported an arrest, we apply this objective reasonableness standard to the facts as they relate to the elements of the alleged crime for which the plaintiff was arrested.  *See Skop*, 485 F.3d at 1137-38 (citing *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1333 (11th Cir. 2004)).  Filbeck contends that he had probable cause to arrest Plaintiffs for three crimes: burglary, criminal trespass, and theft by taking.  If probable cause or arguable probable cause supported the arrest of Plaintiffs for any of these three crimes, Filbeck is entitled to qualified immunity.  So we consider the facts as they relate to the elements of each of these three crimes.

We begin with burglary.  Under Georgia law, as relevant here, a person commits first-degree burglary when, "*without authority* and with the intent to commit a felony or theft therein, he . . . enters or remains within an occupied, unoccupied, or vacant dwelling house of another or any building . . . designed for use as a dwelling of another."  *See* O.C.G.A. § 16-7-1(b) (emphasis added).

15

Second-degree burglary occurs when the structure entered or remained in is not the dwelling of another. *See* O.C.G.A. § 16-7-1(c).

As for criminal trespass, as possibly relevant in this case, a person violates the law if he "knowingly and maliciously interferes with the possession or use of the property of another person *without consent* of that person." O.C.G.A. § 16-7-21(a) (emphasis added). Alternatively, a person commits this offense if he "knowingly and *without authority*" either "[e]nters upon the land or premises of another person . . . for an unlawful purpose," O.C.G.A. § 16-7-21(b)(1) (emphasis added), or "[e]nters upon the land or premises of another person . . . after receiving, prior to such entry, notice from the owner [or] rightful occupant . . . that such entry is forbidden . . . ," O.C.G.A. § 16-7-21(b)(2) (emphasis added).

Finally, a person commits the offense of theft if he "*unlawfully* takes or, being in lawful possession thereof, *unlawfully* appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated." *See* O.C.G.A. § 16-8-2 (emphasis added).

The common thread running through all of these offenses is a lack of authority: a lack of authority to be at or inside the Property and a lack of authority to remove the Property's contents. So our analysis of whether Filbeck had arguable probable cause to arrest Plaintiffs for any or all of these crimes

16

necessarily focuses on whether a reasonable officer in Filbeck's position should have known that Plaintiffs were authorized to prepare the Property for sale following the foreclosure.  *Case*, 555 F.3d at 1327 (we review the officer's conduct based on all the information available to him).  Because a reasonable officer should have known both that Plaintiffs were authorized to enter the Property and that they were authorized to remove its contents, Filbeck lacked even arguable probable cause for his arrests of Plaintiffs.

Indeed, before Filbeck ever arrived at the Property on February 22, he knew that MDM was authorized to enter and clean out the Property.  He knew this from at least two different sources.  First, he admitted that he tore down the MDM Notice from the Property before boarding the Property up and placing "KEEP OUT" signs on it around January 19.  The MDM Notice expressly stated that the house was foreclosed upon, that Ocwen and Altisource controlled the property,[9] and that anyone with questions or who needed access to the house, should contact MDM at a designated phone number.  From the MDM Notice alone, Filbeck had enough information to know that Plaintiffs, MDM employees, were not engaged in burglary, criminal trespass, or theft on February 22.

[9] Filbeck had also agreed in his Security Deed that, upon his abandonment of the Property, Ocwen could "do . . . whatever is reasonable or appropriate to protect Lender's interest in the Property," including entering, securing, and repairing it.  And Filbeck admitted receiving Ocwen's notices of foreclosure and seeing Ocwen's advertisements advertising the sale of the Property at foreclosure.  In fact, he conceded that he left the Property in November 2010 at least in part because of the foreclosure.  Tina also attested that Filbeck admitted to her on the phone on February 22 that he knew of the foreclosure.

17

Second, Filbeck's own law-enforcement colleague, Middleton, independently told him that MDM's paperwork appeared to be in order when, before the February 22 incident, he informed Filbeck about his interaction with David at the Property on January 31, 2011.

As if that were not enough, on February 22 at the time of the arrests, Plaintiffs also attempted to provide Filbeck with everything he needed to know in order to conclude that Plaintiffs were authorized to be at the Property and to clean it out and that, as a result, he lacked probable cause to arrest them.[10]  David presented documentation to Vaughan demonstrating Plaintiffs' authorization to enter and clean out the Property.  And Mundy testified that he saw Vaughan give documentation to Filbeck.  Filbeck's refusal even to look at it does not somehow excuse any ignorance he now claims to have had of its contents.  A police officer may not "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts."  *Kingsland*, 382 F.3d at 1229 (internal quotation marks and citations omitted).  Nor may an officer "choose to ignore information that has been offered to him or her."  *Id.*  Here, it is clear that no reasonable officer with the information that was readily available to Filbeck at the time he arrested Plaintiffs

---

[10] For this reason, Filbeck's reliance on various cases involving criminal defendants who had illegally entered the premises, without any authorization at all, is entirely misplaced.  *See*, *e.g.*, *Harrison v. Georgia*, 74 Ga. 801 (1885), and *Davis v. State*, 706 S.E.2d 710 (Ga. Ct. App. 2011).  Here, Plaintiffs were clearly authorized to enter the Property.

18

could have believed that he had probable cause to arrest them for burglary, criminal trespass, or theft.[11]

Instead, a jury could reasonably conclude that Filbeck arrested Plaintiffs to retaliate against them for Ocwen's lawful foreclosure upon and clean-up of Filbeck's former home. *See*, *e.g.*, *Motes v. Myers*, 810 F.2d 1055 (11th Cir. 1987) (reversing summary judgment in favor of officers and recognizing cause of action under § 1983 for false arrest and imprisonment motivated by the desire to settle a private dispute). As we have previously explained, "The principles behind qualified immunity would be rendered meaningless if such immunity could be invoked to shelter officers who, because of their own interests, allegedly flout the law, abuse their authority, and deliberately imperil those they are employed to serve and protect." *Kingsland*, 382 F.3d at 1234. If a jury believes Plaintiffs' evidence, it will necessarily find that Filbeck did just that—flout the law and abuse his authority because of his own interests. Qualified immunity is neither appropriate nor available under these circumstances.

Filbeck attempts to explain and excuse his behavior by claiming that he was a tenant at sufferance at the Property, meaning that Ocwen and its agents legally

---

[11] In fact, Mundy and Vaughn, other deputies who were present when Filbeck arrested Plaintiffs, expressed their view to each other (though not to Filbeck) that no arrests should have been made, and Mundy characterized the investigators who were present during the arrests, as "hesitant."

could not have entered and cleaned out the Property without first evicting Filbeck. We do not agree.

It is true that under Georgia law, "[w]here former owners of real property remain in possession after a foreclosure sale, they become tenants at sufferance." *Steed v. Fed. Nat'l Mortg. Corp.*, 689 S.E.2d 843, 848 (Ga. Ct. App. 2009). When this occurs, a landlord-tenant relationship exists between the legal title holder and a tenant at sufferance, and dispossessory procedures set forth in O.C.G.A. § 44-7-50 provide the exclusive method by which a landlord may evict the tenant. *Steed*, 689 S.E.2d at 848.

But, significantly, when former owners of real property relinquish possession of the property at some point after the foreclosure sale, they cease being tenants at sufferance. *Id.* And if they later reenter the property, they are not tenants at sufferance; instead, their status becomes that of intruders. *Id.* Georgia courts have explained that the legal title holder need not follow the procedures articulated in O.C.G.A. § 44-7-50 when former owners are intruders. *Id.*

On this record, a reasonable jury could easily find that the Filbecks abandoned the Property in November 2010. By February 22, the Filbecks had not lived at the Property for nearly four months. Instead, they lived with family members at another address, where they received their mail. The Property lacked electricity and water service beginning in November, and cobwebs enveloped

20

almost every room. Filbeck's fellow officer Middleton concluded no one lived at the Property when he visited on January 31. And Filbeck's neighbor separately confirmed to MDM that no one lived at the Property. Even Filbeck admitted that he had not resided at the Property since early November 2010.

Nor do Filbeck's January 19 actions in tearing down the MDM Notices and boarding up the windows, nailing the doors shut, and posting "KEEP OUT" signs somehow change the fact that he abandoned the Property three months earlier. Instead, they made him an intruder. *See Steed*, 689 S.E.2d at 848. Significantly, Filbeck never contacted Ocwen or otherwise attempted to challenge the foreclosure. Rather, he simply moved out. In short, a jury could reasonably conclude on this record that Filbeck was never a tenant at sufferance after the foreclosure had been finalized, and he—not Plaintiffs—was the intruder on February 22.

For these reasons, we affirm the district court's denial of summary judgment to Filbeck on qualified-immunity grounds.

## B. Conversion Claim

In addition to the § 1983 claim, Plaintiffs also alleged that $20.00, two cameras, and silverware were taken from their truck at the time of their arrest and were never returned to them. On appeal, the County and Sheriff Pope contend that the district court erred in not granting them summary judgment on the conversion

21

claim, as sovereign immunity allegedly protects them. The County and Sheriff Pope, along with Filbeck, also assert that the district court erred substantively in denying their motion for summary judgment because Plaintiffs (1) did not demonstrate proof of ownership of the items they claim were taken, (2) did not allege that any Defendants ever possessed the property, and (3) did not aver that Defendants refused to return the property.

We first address the issue of sovereign immunity. In Georgia, "sovereign immunity extends to the state and all of its departments and agencies." Ga. Const. art. I § 2, ¶ IX; *Gilbert v. Richardson*, 452 S.E.2d 476, 479 (Ga. 1994). This includes sheriffs and counties. *Id.* A defendant sued in his official capacity is entitled to the benefit of the sovereign-immunity defense, but only to the extent that the County has not waived it. *Id.* at 754. As a result, both the County and Sheriff Pope are entitled to sovereign immunity against the state-law tort of conversion unless Plaintiffs can show that sovereign immunity has been waived. *See Seay v. Cleveland*, 508 S.E.2d 159, 161 (Ga. 1998); *Bd. of Regents of the Univ. Sys. of Ga. v. Daniels*, 446 S.E.2d 735 (Ga. 1994).

Plaintiffs, however, presented no argument or evidence that sovereign immunity has been waived for the County or Sheriff Pope as to the conversion claim. And we can find no basis for concluding that sovereign immunity has been waived.

In Georgia, sovereign immunity may be waived only if "a statute expressly provides that sovereign immunity is waived and the extent of such waiver." *Grech v. Clayton Cty.,* 335 F.3d 1326, 1341 (11th Cir. 2003) (citing Ga. Const. art. I, § 2, ¶ 9(e)). Here, none does. While the State of Georgia waived its immunity for tort claims in the Georgia Tort Claim Act, it did so only with respect to Georgia *state* employees, not to counties or county employees. *See* O.C.G.A. § 50-21-23(a) ("The state waives its sovereign immunity for the torts of *state* officers and employees acting within the scope of their official duties or employment.") (emphasis added); *see also Lill v. Deal*, No. CV 212-175, 2014 WL 3697356 at *8 (S.D. Ga. July 23, 2014), *aff'd sub nom. Lill v. Governor of Ga.*, 604 F. App'x 911 (11th Cir. 2015). As a result, the Act's sovereign-immunity waiver does not extend to a county. *Woodard v. Laurens Cty.*, 456 S.E.2d 581, 582 (Ga. 1995); *DeKalb Cty. Sch. Dist. v. Gold*, 734 S.E.2d 466, 474 n.51 (Ga. Ct. App. 2012), *overruled on other grounds by Rivera v. Washington*, Nos. S15Go887, S15Go912, ___ S.E.2d___, 2016 WL 1190390, *5 n.7 (Ga. Mar. 25, 2016).

And while Georgia law allows a county to waive immunity through the purchase of liability insurance for which the defense of sovereign immunity would otherwise have been available, *see* O.C.G.A. § 36-33-1, the record contains no evidence that the County has, in fact, purchased liability insurance that would waive sovereign immunity. The burden of demonstrating a waiver of sovereign

immunity falls on the party seeking to benefit from it. *See Smith v. Chatham Cty.,* 591 S.E.2d 388, 389 (Ga. Ct. App. 2003). Because Plaintiffs have not satisfied this burden, the County and Sheriff Pope were entitled to summary judgment on the conversion claim.

As for the conversion claim brought against Filbeck individually, as we have noted, Filbeck argues that he is entitled to summary judgment because Plaintiffs failed to establish the necessary elements of the claim. Georgia codified the common-law action of conversion at O.C.G.A. § 51-10-1. Georgia courts have construed § 51-10-1 as authorizing the "recovery of damages when a government official, without lawful authority, deprives an individual of his or her property on even a temporary basis." *See Romano v. Ga. Dep't of Corr.*, 693 S.E.2d 521, 524 (Ga. Ct. App. 2010). Typically, in order to establish a claim for conversion under Georgia law, a plaintiff must prove the following: (1) proof of ownership or title to the disputed property, or the right to immediate possession of the property; (2) actual possession of the property by the defendant; (3) demand by the plaintiff for the return of the property; (4) the defendant's refusal to return the property; and (5) the value of the property. *See Buice v. Campbell*, 108 S.E.2d 339, 341 (Ga. Ct. App. 1959) (citations omitted); *Charter Mtg. Co. v. Ahouse*, 300 S.E.2d 328, 330 (Ga. Ct. App. 1983) (citation omitted); *City of College Park v. Sheraton Savannah Corp.*, 509 S.E.2d 371, 374 (Ga. Ct. App. 1998).

24

Filbeck contends that Plaintiffs did not sufficiently plead or establish elements one, two, and four.  We disagree.

With respect to the first element, ownership, the Amended Complaint expressly alleges that Plaintiffs' "camera, cash and other personal effects" were "taken . . . by Defendants."  As for evidence, David attested that he owned the camera that was taken.

Regarding the second element—actual possession by the defendant, David testified that the camera was in his truck when Filbeck impounded it upon Plaintiffs' arrest.  And Filbeck implicitly admitted that he actually possessed the camera at some point when it was in the Sheriff's Office's custody, since he acknowledged that he downloaded the disk from the camera onto his laptop.

Finally, Plaintiffs claim that they made a demand for the return of their property, and they never received the items back.  But even if they hadn't demanded their property back, Georgia courts have recognized that demand and refusal are not required where a person comes into possession of the property unlawfully.  *See Williams v. Nat'l Auto Sales, Inc.*, 651 S.E.2d 194, 197 (Ga. Ct. App. 2007).  In this case, Filbeck admits that he took the camera without a warrant, while the car was impounded.  This certainly raises the issue of unlawful possession.  Moreover, the circumstances under which the impounding occurred— the alleged wrongful arrest of Plaintiffs—only add to the inference of unlawful

25

possession.  As the district court correctly noted, O.C.G.A. § 51-10-1 authorizes "recovery of damages when a governmental official, without lawful authority, deprives an individual of his or her property on even a temporary basis."  *See Romano*, 693 S.E.2d at 524.

This evidence, if believed by a jury, could establish a substantive claim of conversion under Georgia law, against Filbeck.  For this reason, the district court correctly denied summary judgment to Filbeck on the conversion claim.

## IV.

In conclusion, we affirm the denial of Filbeck's motion for summary judgment based on qualified immunity.  We also affirm the denial of Filbeck's summary judgment motion as it relates to the conversion claim against him.  But we reverse the denial of summary judgment with respect to the County and Sheriff Pope on the conversion claim.  The matter is remanded for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**