[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13930
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cv-04452-ELR


ROBERT F. ABERCROMBIE, JR.,

Plaintiff - Appellant,

versus

TREY BEAM,

Defendant - Appellee.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(March 15, 2018)

Before WILSON, JORDAN, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Robert Abercrombie, Jr., brought this civil-rights action under 42 U.S.C. § 1983 for false arrest and malicious prosecution, in violation of the Fourth and Fourteenth Amendments, and under Georgia state law for false imprisonment and malicious prosecution. Abercrombie alleges that then-Deputy Trey Beam arrested and prosecuted him without probable cause after conducting a one-sided and constitutionally deficient investigation. The district court granted Beam summary judgment, finding that he was entitled to qualified immunity under federal law and to official immunity under Georgia state law. For the reasons that follow, we affirm in part and vacate and remand in part.

## I.

We review *de novo* the district court's disposition of a summary-judgment motion based on qualified immunity. *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Our analysis begins "with a description of the facts in the light most favorable to the plaintiff." *Id.* "[W]hen conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1277–78 (11th Cir. 2005) (*en banc*) (emphasis omitted). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The relevant facts, in the light most favorable to Abercrombie, are these. At around 5:30 p.m. on December 10, 2014, Deputy Beam was dispatched to respond

2

to a 911 "fight" call at an AAMCO shop in Conyers, Georgia.  The 911 caller,
Priscilla Nixon, reported that Abercrombie, a co-owner of the AAMCO, "had
thrown a document at [her] and struck [her]."  Beam's incident report states that he
knew before he arrived that "the fight was no longer in progress."

When Beam arrived in the lobby of the AAMCO, he identified and spoke
with Nixon and her fiancé, who were standing at the counter directly across from
Abercrombie and Laura Byrant, a part-time employee who is also Abercrombie's
sister.  Nixon told Beam that Abercrombie became "irate" and threw an invoice for
the repairs to her car at her face.  She said that she feared for her safety.
Meanwhile, Abercrombie assisted another customer, who was standing in the
lobby when Beam arrived.

After Beam spoke with Nixon, he went to find Abercrombie, who had left
the main lobby area to retrieve the other customer's keys from a back room.  Soon
after, Beam handcuffed Abercrombie, walked him outside, and secured him in a
patrol car.  Both Abercrombie and Bryant testified that Beam, before he
handcuffed Abercrombie, did not ask Abercrombie any questions about the
incident and instead simply told him that he needed to come along and that he was
under arrest.[1]  Abercrombie further testified that Beam refused to tell him why he

---

[1] Beam claims that he asked Abercrombie for his side of the story before handcuffing
him, but Abercrombie was uncooperative and repeatedly refused to answer Beam's questions.  In
support of his version of events, Beam relies on the dash-camera footage from Deputy Charles

3

was being arrested and "just told [him] to shut up." Abercrombie testified that Beam likewise told Bryant and Anthony Diamond, a part-time AAMCO technician, to "shut up or they'd be arrested." Abercrombie was in handcuffs less than three minutes after Beam arrived.

As Abercrombie was being led out in handcuffs, another deputy, Charles Dixon, arrived on the scene. While Dixon remained inside, Beam secured Abercrombie in a patrol car, and then spoke briefly with Bryant outside of the AAMCO. But, Bryant testified, Beam "never asked [her] what had happened in the shop and it was obvious he had no interest in finding out."[2] Instead, he told her "to shut up unless [she] wanted to be arrested" for obstruction of justice.

---

Dixon's patrol car. The dash camera recorded video of the front doors of the AAMCO and audio of a small part of events inside the AAMCO (the audio malfunctioned after a couple minutes). From a distance, the dash-camera footage shows Dixon opening the door to the AAMCO and asking, "What's going on?" Though we cannot see anything going on in the store beyond that, we can hear a woman respond, "That young man there is trying to get a statement from him and he is going away." Citing the woman's statement, Beam attests that he "attempted to speak with Plaintiff to get his side of the story, but Plaintiff ignored Beam." But nothing in the footage shows the woman or whom she is talking about. And nothing in the footage shows any of the events about which the woman is speaking. The problem here is that based on the limited footage, we cannot rule out Abercrombie's sworn version of the facts in which he states that "[a]t no time on December 10, 2014, did Mr. Beam attempt to get my side of the story either before he handcuffed me or after he handcuffed me." So the dash camera footage does not render Abercrombie's version of events incredible as a matter of law. *Cf. Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible."). Resolving all factual disputes in favor of Abercrombie, we credit his version of events for purposes of summary judgment. *See Evans*, 407 F.3d at 1278.

[2] Again, Beam offers a different version of events. According to Beam, he attempted to speak with Bryant, but she was "being belligerent" and refused to answer his questions about the incident. That fact is disputed, however. Beam also claimed that Bryant's belligerence

Beam then interviewed and took statements from Nixon and her fiancé.  In a statement, the fiancé wrote that Abercrombie "blatantly pushed" a receipt in Nixon's face, hitting her with it as he tried to prevent her from signing a document. According to Abercrombie, Beam did not question Abercrombie, Bryant, Diamond, or the other customer, though he claimed in his incident report that Abercrombie and Bryant refused to speak with him about the incident.

Later, Beam completed an arrest-warrant affidavit, writing that Abercrombie placed Nixon in reasonable apprehension of immediately receiving a violent injury "when he shoved a three page invoice in [Nixon's] face causing her to fall back." A magistrate judge signed the warrant.  It appears that Abercrombie posted bond a day or two after his arrest, and the charge was later dismissed.

## II.

Abercrombie sued Beam under § 1983 for false arrest and malicious prosecution, in violation of his rights under the Fourth and Fourteenth Amendments, and under state law for false imprisonment and malicious

---

prevented him from interviewing other witnesses, as he feared the situation would devolve if he stayed and attempted further investigation inside the store.  However, that claim is also subject to dispute.  Bryant denies being belligerent, Beam offered no specific details about Bryant's obstructive conduct either in his testimony or in the incident report, Beam did not actually attempt further investigation, and there was another deputy at the AAMCO for most of the time that Beam was on the scene.  Although AAMCO's surveillance footage depicts Bryant walking in and out of the AAMCO several times, nothing in the footage appears to show Bryant interfering or attempting to interfere with Beam's investigation.  Accordingly, for purposes of summary judgment, we credit Bryant's testimony on these issues.  *See Evans*, 407 F.3d at 1278.

5

prosecution.    Abercrombie claimed that Beam conducted a constitutionally deficient investigation and arrested and prosecuted him without probable cause.

Among other allegations, Abercrombie faulted Beam for failing to interview available witnesses or to review AAMCO's surveillance footage.  Abercrombie argued that Beam should have been aware of the surveillance footage because, on his way in to the AAMCO, he passed a sign on the door that clearly stated, "VIDEO SURVEILLANCE IN PROGRESS 24/7."

The AAMCO surveillance footage, which lacks audio, depicts Nixon and her fiancé enter the AAMCO on December 10, 2010.  After a discussion, Abercrombie and Bryant prepared the receipts or invoices at issue.  Meanwhile, Nixon made a call on her cell phone, apparently to 911.  Bryant then placed two documents on the counter between them.  As Nixon leaned over to look at the documents, Abercrombie attempted to put another document on top, but it curled up as he did so.  Abercrombie flipped his wrist upward, which caused the document to flap in Nixon's face and possibly make contact with her before straightening out, and then placed the document on top of the other two documents and Nixon's hand.  While the surveillance footage suggests that Nixon may have been lightly hit with a piece of paper that was in Abercrombie's hand, it is not consistent with Nixon's claim that Abercrombie angrily threw an invoice at her face.

In addition, both Bryant and Diamond testified that they were present in the AAMCO at the time of the incident between Nixon and Abercrombie. Neither recalled seeing Abercrombie throw an invoice or otherwise take any action that would give Nixon reason to fear for her safety. At her deposition, Bryant testified that Abercrombie simply gave Nixon a receipt. Diamond likewise testified that he saw Abercrombie place a piece of paper in front of Nixon, who then exclaimed, "Did you just assault me?"

The district court granted summary judgment to Beam, concluding that he was entitled to qualified immunity under federal law and to official immunity under Georgia state law. The court found that Abercrombie's § 1983 claims failed because at least arguable probable cause supported the arrest and subsequent prosecution. Further, the court concluded that Beam's investigation was not constitutionally deficient because he interviewed the victim and a witness. As for the state-law claims, the court determined that Beam was entitled to official immunity because there was no evidence that he acted with "actual malice." Abercrombie now appeals.

### III.

We first address Abercrombie's claims under § 1983, which are subject to the defense of qualified immunity. Qualified immunity protects government officials from individual liability for job-related conduct unless they violate clearly

established law of which a reasonable person would have known. *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2013). "It serves the purpose of allowing government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1318–19 (11th Cir. 2016) (quotation marks omitted).

Because Beam was engaged in discretionary duties at the AAMCO, Abercrombie bore the burden to show that qualified immunity did not apply. *Id.* at 1319. "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quotation marks omitted). Specifically, overcoming qualified immunity requires two showings: (1) that the defendant violated a constitutional right and (2) that the right was clearly established at the time of the misconduct. *Carter*, 821 F.3d at 1319.

A.    *False Arrest*

A warrantless arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment and forms a basis for a § 1983 claim of false arrest. *Kingsland v City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004). Conversely, the existence of probable cause is an absolute bar to a § 1983 false-arrest claim. *Id.*

8

Probable cause to arrest exists when the facts and circumstances, of which the officer has reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense. *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007). We assess probable cause based on the "totality of the circumstances." *Id.*

"If an officer lacked probable cause to arrest, we must consider whether arguable probable cause supported the arrest at the time." *Carter*, 821 F.3d at 1319. "If so, the officer is still entitled to qualified immunity, even in the absence of actual probable cause." *Id.* Arguable probable cause "exists where reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant[] could have believed that probable cause existed to arrest." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010) (quotation marks omitted). In other words, qualified immunity still applies if the officer reasonably but mistakenly believed that probable cause existed. *Id.* Arguable probable cause may exist even though an officer may not have definitive proof that every element of a crime has been established. *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010). But "[w]here an officer arrests without even arguable probable cause, he violates the arrestee's clearly established Fourth Amendment right to be free from unreasonable seizures." *Carter*, 821 F.3d at 1320.

Beam contends that he had at least arguable probable cause to arrest Abercrombie for simple assault.  In Georgia, a person commits simple assault when he either (1) "[a]ttempts to commit a violent injury to the person of another," or (2) "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury."  O.C.G.A. § 16-5-20(a); *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137–38 (11th Cir. 2007) (explaining that our probable-cause analysis "depends on the elements of the alleged crime and the operative fact pattern" (citation omitted)).  Beam relies solely on the latter theory, under which the offense "is complete if the assailant has made such a demonstration of violence, coupled with an apparent ability to inflict injury so as to cause the person against whom it is directed reasonably to fear the injury unless he retreats to secure his safety."  *Bearden v. State*, 662 S.E.2d 736, 738 (Ga. Ct. App. 2008) (quotation marks omitted).

Abercrombie first argues that the events as portrayed by Nixon did not support the existence of arguable probable cause.  And if no reasonable officer could have believed that probable cause existed based on her version of events, which was the least favorable to Abercrombie, Beam would not be entitled to summary judgment based on qualified immunity, regardless of the adequacy of his investigation.  *See Carter*, 821 F.3d at 1320.  So the question is whether a reasonable officer in Beam's position could have concluded that the act of angrily

10

throwing a piece of paper in Nixon's face placed her in reasonable apprehension of immediately receiving a violent injury.

In analyzing this issue, we find instructive the Georgia Court of Appeals's decision in *Daniels v. State*, 681 S.E.2d 642 (Ga. Ct. App. 2009). In that case, the court affirmed a simple-assault conviction arising out of a parent-teacher conference gone bad. *Id.* at 643–44. During the conference, the defendant angrily "lashed out in a tirade" directed at the teacher of his grandchild. *Id.* at 644. When the conference ended, the defendant prevented the teacher from leaving the area by continually moving in front of her, getting within an inch of her face and shouting at her. *Id.* The teacher testified that she felt threatened by the defendant's behavior, including his body language, tone, and blocking of her movement. *Id.*

On these facts, the Georgia Court of Appeals held that the defendant's "agitated and angry demeanor, while standing in close proximity to her and blocking her movement in a narrow hall," constituted "a demonstration of violence." *Id.* Further, the court stated, the defendant clearly "had an apparent present ability to inflict injury, in light of the fact that he was standing only inches from his victim's face." *Id.* at 644–45. The victim also testified that she feared harm from the defendant, and other witnesses likewise stated that they feared for her safety. *Id.* at 645. Thus, the court found sufficient evidence to support the assault conviction. *Id.*

11

In light of *Daniels*, we agree with the district court that arguable probable cause could have existed based on Nixon's version of events. The record is undisputed that Nixon told Beam that Abercrombie was "irate," that he angrily threw an invoice in her face, and that she feared for her safety. As the district court reasoned, "angrily throwing an invoice in someone's face could potentially constitute a 'demonstration of violence,' and the close physical proximity that would be necessary to take such an action could likewise convey 'an apparent and present ability to inflict injury.'"[3] Some of the facts here are weaker than those in *Daniels*, of course, but there was no discrete and arguably violent act in that case, like the alleged act of throwing a document here, and "[s]howing arguable probable cause does not . . . require proving every element of a crime." *Brown*, 608 F.3d at 735. Looking solely to Nixon's statements, it would not be unreasonable for an officer to conclude that Abercrombie may have committed simple assault.

Nevertheless, probable cause is evaluated under the totality of the circumstances and must be based on "reasonably trustworthy information." *See Jordan*, 487 F.3d at 1355. And the crux of Abercrombie's false-arrest claim is that there was not arguable probable cause under the totality of the circumstances

---

[3] This comment comes from the district court's order denying Beam's motion for judgment on the pleadings. While the district court did not directly address this same issue in its summary-judgment order, we assume it relied on this same reasoning to find arguable probable cause to arrest.

12

because Nixon's story was not credible and Beam failed to conduct a constitutionally adequate investigation. Citing this Court's decision in *Kingsland*, Abercrombie contends that Beam failed to interview readily available witnesses or review easily obtainable evidence.

In *Kingsland*, we recognized that police officers objectively "should not be permitted to turn a blind eye to exculpatory information that is available to them and instead support their actions on selected facts they chose to focus upon." *Kingsland*, 382 F.3d at 1228. We explained that "a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," *id.* at 1229; but an officer may not "conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts." *Id.* (internal quotation and citation omitted).

In that case, the plaintiff Kingsland alleged that a Miami police officer ran a red light and crashed into the truck she was driving. *Id.* at 1223. Thereafter, about 20 police officers arrived at the scene, but none of them took statements from Kingsland or any other witness except the police officer involved in the crash, who claimed Kingsland was at fault. *See id.* Two officers on the scene reported smelling an odor of cannabis coming from her truck and person, and they arrested her for driving under the influence. *Id.* at 1223–24. They never searched her

vehicle or summoned drug-sniffing dogs to the scene, however, and Kingsland later tested negative for narcotics. *See id.* at 1223–25.

Presented with these facts, we concluded that the "defendants did not act in an objectively reasonable manner under the totality of the circumstances." *Id.* at 1231. We explained that

> [i]t was within the officers' knowledge that Kingsland was involved in an accident, was injured and crying, and faulted Officer De Armas. It may also have been within the officers' knowledge that no evidence of drug use existed in Kingsland's truck or on her person. Yet, Kingsland has come forward with some evidence here that the defendants chose to either ignore or misrepresent those facts, which, if true, makes the information on which they based their arrest less than "reasonably trustworthy" under the circumstances.

*Id.* Because genuine issues of material fact existed as to whether the defendants manufactured probable cause and failed to conduct a reasonable investigation, we found that summary judgment was inappropriate. *Id.*

Beam responds that *Kingsland* is inapposite because here, there was no exculpatory evidence obviously and clearly available to him, there were no allegations of fraudulent conduct, and he relied on the statements of the victim and a witness and not just the claims of another officer. He also argues that he was "entitled to rely on a victim's criminal complaint as support for probable cause." *Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1996).

We conclude that genuine issues of material fact remain as to whether Beam conducted a reasonable investigation and whether reasonable trustworthy

14

information supported the existence of arguable probable cause.[4]  According to the AAMCO surveillance video, when Beam arrived at the AAMCO, he observed Nixon standing at the counter directly across from and in close proximity to Abercrombie.  Despite her claims that she was afraid that Abercrombie would commit violence to her person, Nixon had not moved away from him.  Beam also knew that the AAMCO employees (Abercrombie, Bryant, and Diamond) were confused as to why Abercrombie was being handcuffed.  These facts would suggest the need to further investigate by, for instance, speaking with the other likely witnesses who were then present in the small AAMCO shop.

Yet under the version of events that we must accept as true for purposes of resolving this appeal, Beam made no attempt to "investigate objectively" and clarify the factual situation.  *See Kingsland*, 382 F.3d at 1229.  Specifically, in Abercrombie's version of events, Beam failed to question Abercrombie, Bryant, Diamond, or the other customer about the incident.  The first three all testified that Abercrombie did not throw an invoice at Nixon.  And on the surveillance footage, the other customer did not react in any way to the alleged assault despite being just

---

[4] Abercrombie makes several arguments about what a jury could conclude about the actual facts of the incident, but we evaluate whether an officer had arguable probable cause based on "the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." *Wilkerson v. Seymour*, 736 F.3d 974, 978 (11th Cir. 2013).  The actual facts are relevant only insofar as they were within Beam's knowledge or could have been obtained in a reasonable investigation.

15

a few feet away and looking in that general direction. So had she been asked about the events, she seemed to be in a position to speak knowledgeably.

Nor did any exigency prevent Beam from questioning these persons, particularly after he had detained Abercrombie, as another deputy was on the scene and there was no ongoing altercation. Therefore, Abercrombie has offered evidence that Beam "elect[ed] not to obtain easily discoverable facts, such as . . . whether witnesses were available to attest to" what occurred during the incident. *See id.* at 1229.

Not only that, but under Abercrombie's version of events, Beam's actions could be construed as preventing Abercrombie, Bryant, and Diamond from offering information relevant to the investigation. According to Abercrombie, Beam handcuffed Abercrombie within three minutes of arriving at the AAMCO, yet he refused to tell Abercrombie why he was being arrested and instead "just told [him] to shut up." As for Bryant, Beam likewise told her to "shut up" if she did not want to be arrested, and Diamond testified that he heard Beam threaten Bryant with arrest for asking why Abercrombie was being arrested. In light of evidence that Beam not only failed to interview available witnesses but also actively dissuaded some of them from talking to him, we must conclude that a triable issue exists as to whether Beam conducted an objectively reasonable and unbiased investigation into the alleged assault.

16

The district court found Beam's investigation sufficient based on the fact that he interviewed Nixon's fiancé. But even the fiancé's statement did not fully support Nixon's version of events. He said that Abercrombie "raise[d] his voice" and was "being difficult," but he did not characterize Abercrombie as "irate" or "angry" like Nixon did. In addition, he wrote that Abercrombie "pushed" a receipt in the complainant's face to prevent her from signing a document, not that he "threw" the invoice at her face. And his statement does not indicate that he felt Nixon was in danger from Abercrombie. Therefore, the fiancé's statements did not obviate the need "to investigate both sides of the story." *See Kingsland*, 382 F.3d at 1229.

Based on the totality of the circumstances, and construing the record and drawing all reasonable inferences in Abercrombie's favor, we conclude that there are genuine issues of material fact that make summary judgment inappropriate.[5] Specifically, Abercrombie has come forward with some evidence to show that a reasonable officer in the same circumstances, possessing the same knowledge as the defendant and conducting a reasonable investigation based on that knowledge, could not have believed that probable cause existed to arrest him. Because Abercrombie has produced evidence which, if true, casts doubt on whether Beam

---

[5] In making this determination, we do not rely on Beam's alleged failure to review the AAMCO surveillance video. Although Beam may have been aware that there was a surveillance video, this information was not "offered to him," *Kingsland*, 382 F.3d at 1229, and "a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," *id.* (quotation marks omitted).

17

had arguable probable cause to arrest, qualified immunity is not appropriate at this stage. *See Carter*, 821 F.3d at 1320. Accordingly, we vacate the grant of summary judgment on this claim and remand for further proceedings.

## B.　*Malicious Prosecution*

Abercrombie's claim for malicious prosecution under § 1983 is based on the same facts as his false-arrest claim, plus the additional fact that Beam submitted an arrest-warrant affidavit, which was signed by a magistrate judge. The district court concluded that a malicious-prosecution claim failed for the same reason as a false-arrest claim: the presence of arguable probable cause to arrest.

A § 1983 claim for malicious prosecution requires a plaintiff to "prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir. 2010); *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). Thus, in addition to the common-law elements, the plaintiff must prove that he was "seized in relation to the prosecution, in violation of [his] constitutional rights." *Kingsland*, 382 F.3d at 1235.

As this Court expressed in *Kingsland*, a plaintiff's warrantless arrest "cannot serve as the predicate deprivation of liberty because it occurred prior to the time of arraignment, and was not one that arose from malicious prosecution as opposed to false arrest." *Id.* (quotation marks omitted). For purposes of a malicious-

prosecution claim when a warrantless arrest occurs, "the judicial proceeding does not begin until the party is arraigned or indicted." *Id.* And the normal conditions of pretrial release, such as bond and a summons to appear, do not constitute a seizure, "barring some significant, ongoing deprivation of liberty, such as a restriction on the defendant's right to travel interstate." *Id.* at 1236.

Under the facts of this case, Abercrombie cannot maintain a separate § 1983 claim for malicious prosecution. The record does not show that Abercrombie suffered a Fourth Amendment "seizure" after the prosecution began. It appears that, after arraignment, Abercrombie was released once he posted bond. At some point thereafter, the prosecutor dismissed the charge. Nothing in the record indicates any significant or ongoing deprivation of liberty imposed as a condition of pretrial release. Consequently, Beam is entitled to summary judgment on this claim. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251–52 (11th Cir. 2013) (stating that we may affirm the district court's judgment on any ground supported by the record).

## IV.

Abercrombie also brought claims under Georgia state law for false imprisonment and malicious prosecution. The district court concluded that Beam was entitled to official immunity under Georgia state law.

19

Under Georgia's doctrine of official immunity, state public officials are not personally liable for discretionary acts performed within the scope of their official authority. *Cameron v. Lang*, 549 S.E.2d 341, 344 (Ga. 2001). Public officials do not enjoy official immunity under Georgia law, however, when "they act with actual malice or with actual intent to cause injury in the performance of their official functions." Ga. Const. art. I, § 2, ¶ IX(d); *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007).

According to the Georgia Supreme Court, "'[a]ctual malice,' as that term is used in the constitutional provision, denotes 'express malice,' i.e., a deliberate intention to do wrong, and does not include 'implied malice,' i.e., the reckless disregard for the rights or safety of others." *Murphy*, 647 S.E.2d at 60 (quoting *Merrow v. Hawkins*, 467 S.E.2d 336, 337 (Ga. 1996)). Although "ill will" may contribute to a finding of actual malice, "its presence alone cannot pierce official immunity; rather, ill will must also be combined with the intent to do something wrongful or illegal." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999).

Under Georgia law, the record may support an inference of actual malice where evidence indicates that the police officer arrested the plaintiff despite having knowledge that the plaintiff did not commit the crime for which he was arrested. *See City of Atlanta v. Shavers*, 756 S.E.2d 204, 206-07 (Ga. Ct. App. 2014), *overruled on other grounds by Rivera v. Washington*, 784 S.E.2d 775, 780 n.7 (Ga.

2016); *Bateast v. Dekalb County*, 572 S.E.2d 756, 758 (Ga. Ct. App. 2002). However, the mere lack of probable cause does not permit an inference of actual malice. *Anderson v. Cobb*, 573 S.E.2d 417, 419 (Ga. Ct. App. 2002). Similarly, allegations of an improper or inadequate investigation do not, without more, show actual malice. *See id.*

Here, a reasonable jury could not infer from the evidence that Beam deliberately intended to do wrong. Even assuming that the evidence is sufficient to show that Beam exhibited a reckless disregard for Abercrombie's rights to be free from unlawful arrest, that is not enough to pierce official immunity under Georgia law. *See Murphy*, 647 S.E.2d at 60. In light of the statements from Nixon and her fiancé, "there was not such a lack of evidence of [Abercrombie's] guilt" that a jury could infer that Beam arrested Abercrombie and pursued his prosecution "with the knowledge that [he] was not guilty and so intended to do wrong." *Marshall v. Browning*, 712 S.E.2d 71, 74–75 (Ga. Ct. App. 2011). While there is some evidence of Beam's "ill will" after the arrest, such as a snide comment by Beam to an AAMCO employee about Abercrombie's arrest, "its presence alone cannot pierce official immunity; rather, ill will must also be combined with the intent to do something wrongful or illegal." *Adams*, 520 S.E.2d at 898. Because there was not sufficient evidence of intentional wrongdoing, we conclude that Beam is entitled to official immunity under Georgia state law.

Although it might at first glance seem incongruous for us to find that Beam is entitled to official immunity under Georgia law but not to qualified immunity under federal law, the difference flows from the nature of the standard. Qualified immunity is evaluated based on an objective standard of reasonableness and "evidence of improper motive is irrelevant to . . . [the] analysis." *Koch v. Rugg*, 221 F.3d 1283, 1295 (11th Cir. 2000); *see Kingsland*, 382 F.3d at 1229 ("[T]he constitutional reasonableness of a police investigation does not depend on an officer's subjective intent or ulterior motive in conducting the investigation . . . ."). Official immunity, by contrast, is based on a subjective standard of "actual malice," which means a "deliberate intention to do wrong." *See Murphy*, 647 S.E.2d at 60. And the facts construed in Abercrombie's favor show objectively unreasonable investigatory conduct but no deliberate intention to do wrong.

Accordingly, we affirm the district court's grant of official immunity on Abercrombie's state-law claims. Without a viable claim under Georgia law, Abercrombie's state-law claim for punitive damages cannot survive, so we affirm the court's judgment on this claim also.

## IV.

For the reasons stated, we conclude that genuine issues of material fact preclude summary judgment on Abercrombie's claim for false arrest under § 1983.

We therefore vacate and remand for further proceedings on that claim.  We affirm the judgment of the district court in all other respects.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**