[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11270
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-00066-WBH

PETER MEYER,

Plaintiff-Appellant

versus

GWINNETT COUNTY,
GWINNETT COUNTY POLICE DEPARTMENT,
JENNIFER ROBERTS,
individually and in her official capacity as a
Gwinnett County Police Officer,
KIRK BASONE,
LA PETITTE ACADEMY, INC.,

Defendants-Appellees,

VICTORIA KIRKPATRICK,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 14, 2017)

Before TJOFLAT, WILLIAM PRYOR, and ROSENBAUM, Circuit Judges.

PER CURIAM:

This case stems from Plaintiff Peter Meyer's arrest and detention on charges of sexually abusing a family friend's five-year-old daughter. Those charges were eventually dropped, and Gwinnett County released Meyer from jail in December 2011, after he had been detained for nearly twenty months. Over two years after his release, in January 2014, Meyer sued the entities and persons involved in his arrest and detention—Gwinnett County, the Gwinnett County Police Department, Officer Jennifer Roberts, Kirk Basone, La Petite Academy, Inc., and Victoria Kirkpatrick—asserting state claims of malicious prosecution, false imprisonment, and defamation, and a federal claim of deliberate indifference to constitutional rights under 42 U.S.C. § 1983.

Conceding that his lawsuit was not timely filed, Meyer sought the benefit of a provision of Georgia law that allows for tolling of the statute of limitations during periods of mental incapacity, which he claimed to have experienced at times after his release as a result of his traumatic experiences in jail. *See* O.C.G.A. §§ 9-3-90(a), 9-3-91. The defendants filed motions for summary judgment, arguing that the tolling provision did not apply and that Meyer's claims were barred by the applicable statute of limitations. The district court granted the defendants' motions, and Meyer now appeals. Because we agree with Meyer that a genuine

2

issue of material fact exists as to whether he suffered mental incapacity sufficient to toll the statute of limitations, we vacate the grant of summary judgment and remand for further proceedings consistent with this opinion.

## I.

According to Meyer's second amended complaint, Meyer was living with family friends and their five-year-old daughter in April 2010. Meyer often watched the child while her parents were out of town, including on April 5. On that date, Meyer picked up the child from La Petite Academy, where the child had just started attending a kindergarten class taught by Kirkpatrick. Two days later, Kirkpatrick suggested to Basone, the child's father, that Meyer may have sexually abused the child because the child had placed her hands in her pants during class earlier in the week.

Basone eventually contacted the Gwinnett County Police Department and met with Officer Roberts, who interviewed both Basone and the child. After the meeting, an arrest warrant was issued for Meyer for the crime of aggravated sexual battery. A few months after his arrest, Meyer was charged with two additional counts of child molestation. He was denied bond and detained in the Gwinnett County Jail for nearly twenty months. Gwinnett County eventually dropped the charges and released him on December 28, 2011, after he took a polygraph test.

3

Meyer filed this lawsuit in January 2014.  Nearly all of Meyer's claims are subject to a two-year limitations period.[1]  *See* O.C.G.A. § 9-3-33 (personal injury claims in Georgia must be "brought within two years after the right of action accrues"); *Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir. 1986) ("[T]he proper limitations period for all section 1983 claims in Georgia is the two year period set forth in O.C.G.A. § 9-3-33 for personal injuries.").  Conceding that his complaint was not timely filed, Meyer alleged that he was entitled to tolling of the statute of limitations because, upon his release, he was so unsound of mind that he was unable to carry on his ordinary life affairs.  *See* O.C.G.A. §§ 9-3-90(a), 9-3-91.

The district court initially granted the defendants' motion to dismiss the complaint as time barred, but, on appeal, we vacated that decision and remanded the case for further proceedings.  *See Meyer v. Gwinnett Cty.*, 636 Fed. App'x 487 (11th Cir. 2016).  On remand, the district court allowed the parties to conduct discovery limited to the tolling issue.

After the close of discovery, Gwinnett County (including the Gwinnett County Police Department and Roberts) and La Petite Academy filed motions for

---

[1] The exception is Meyer's defamation claim, which was subject to a one-year limitations period. *See* O.C.G.A. § 9-3-33.  The district court determined that this claim was untimely after rejecting Meyer's contention that the alleged defamatory comments had been republished within a year of the filing of the complaint.  Meyer does not challenge that determination on appeal and so has abandoned the issue.  *See Sapuppo v. Allstate Floridian Inc. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not raised on appeal are abandoned).  Because the claim would be untimely even if Meyer could establish tolling for mental incapacity, we affirm the grant of summary judgment on this claim.

summary judgment, arguing that the lawsuit was time barred.[2]  They relied on Meyer's deposition testimony in support of their claim that he had sufficient mental capacity to manage his daily affairs.  Meyer responded in opposition, relying on his deposition testimony, a personal affidavit, affidavits from coworkers, and three affidavits from his treating therapist, Dr. Nancy Aldridge.  Meyer claimed to be legally incompetent during two specific periods: (1) the first three weeks following his release; and (2) a one-month period in May and June 2013.

The district court granted the motions for summary judgment, separately addressing the two periods of alleged incapacity and resolving them on different grounds.  With regard to the first period, the court concluded that Meyer's evidence established that he "suffer[ed] from serious and significant mental illness" but that he "was able to surpass the very low threshold of being able to manage the affairs of his life."  Meyer, the court explained, "had a place to live, he lived by himself, he got food, he got a job, he got dressed, he got to work, and he got back home."  In short, the court concluded, Meyer was able to manage his own affairs, however minimally.

As for the second period, the district court found that Meyer "c[a]me closer to establishing that he could not manage his affairs."  The court noted that Meyer

---

[2] The district court dismissed Kirkpatrick from the lawsuit for failure to perfect service, a decision Meyer does not challenge.  Basone did not move for summary judgment.

"quit his job, stayed in his room, and did almost nothing save sending a few emails and driving himself to see his therapist." The court nevertheless concluded that Meyer could not benefit from the tolling provision because it was limited to situations "where it is not fair to charge a suitor with the running of the clock, because of his mental condition." *Martin v. Herrington Mill, LP*, 730 S.E.2d 164, 166 (Ga. Ct. App. 2012). The court explained that Meyer had engaged the services of his current counsel in May 2012, a year before the second period of alleged incapacity, so his "temporary mental incapacity could not have had a significant effect on the timing of his lawsuit." As a result, the court reasoned that it would not be unfair to charge Meyer with the running of the clock during the second period of alleged incapacity. On the contrary, the court stated, it would be unfair to the defendants to suspend the statute of limitations simply because Meyer's counsel failed to file suit on time. Meyer now brings this appeal.

On appeal, Meyer addresses the first determination in detail, but, significantly, he fails to address the court's second determination entirely. That is, he argues that he produced sufficient evidence to meet the standard of mental incapacity, but he does not challenge the court's conclusion that the tolling statute did not apply where a plaintiff's temporary mental incapacity did not have "a significant effect on the timing of his lawsuit." As a result, we must conclude that he has abandoned any challenge to the court's interpretation of the tolling statute

6

and its resolution of the May and June 2013 period of alleged incapacity. *See Sapuppo v. Allstate Floridian Inc. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (issues not raised on appeal are abandoned). Accordingly, we affirm the district court on that issue.

The sole issue in this appeal, therefore, is whether Meyer suffered mental incapacity sufficient to toll the statute of limitations during the three-week period immediately following his release on December 28, 2011.

## II.

We review *de novo* a district court's grant of summary judgment, applying the same legal standards that governed the district court. *Bradley v. Franklin Collection Serv., Inc.*, 739 F.3d 606, 608 (11th Cir. 2014). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary-judgment stage, the court's function is simply to determine if there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). To do so, we must accept the non-moving party's version of the facts and draw all reasonable inferences in his favor. *Bradley*, 739 F.3d at 608. We do not weigh the evidence or make credibility determinations. *Carter v. Butts Cty.*, 821 F.3d 1310, 1318 (11th Cir. 2016).

## III.

Under Georgia law, a plaintiff is entitled to tolling of the applicable statute of limitations during periods when he or she is "legally incompetent because of intellectual disability or mental illness." O.C.G.A. § 9-3-90(a) (disability before accrual of right of action); *id.* § 9-3-91 (disability after accrual of right of action). Georgia courts have interpreted the tolling statute as "confined to situations where it is not fair to charge a suitor with the running of the clock, because of his mental condition." *Martin*, 730 S.E.2d at 166.

The accepted test for mental incapacity under the tolling statute is whether the plaintiff is so unsound of mind or so diminished in intellectual capacity as to be incapable of managing the ordinary affairs of life. *Id.*; *Tri-Cities Hosp. Auth. v. Sheats*, 273 S.E.2d 903, 905 (Ga. Ct. App. 1980); *see Charter Peachford Behavioral Health Sys. v. Kohout*, 504 S.E.2d 514, 524 (Ga. Ct. App. 1998) ("Mental incapacity that tolls the statute is the unsound mind that renders the plaintiff incapable of acting for him or herself in order to carry on her business, to undertake or maintain a suit for the recovery of her property, to prosecute her claim, and to manage the ordinary affairs of life.")

Recognizing that "the concept challenges crisp articulation," the Georgia Court of Appeals has elaborated that

> [t]he test for mental incapacity is not whether one did not manage his own affairs, acquiescing in the management thereof by others, or whether one has merely managed his affairs unsuccessfully or badly. That one was not "bright" or not clear about some matters occurring

8

during the period is not evidence of mental incompetency.  The test is one of capacity—whether the individual, being of unsound mind, *could not* manage the ordinary affairs of his life.

*Chapman v. Burks*, 357 S.E.2d 832, 835 (Ga. Ct. App. 1987) (citations omitted) (emphasis in original).  While the test contemplates a high degree of mental impairment, the "plaintiff need not be so mentally incompetent that she requires confinement or a guardian," *Martin*, 730 S.E.2d at 166, and evidence that the plaintiff "was without sufficient mental capacity to perform or understand his conduct during the relevant period would meet the test," *Chapman*, 357 S.E.2d at 835 (citing *Sheats*, 273 S.E.2d at 906) (internal quotation marks omitted).

Ordinarily, the question of mental incapacity is one of fact to be determined by the jury.  *Sheats*, 273 S.E.2d at 905.  Nevertheless, court may decide the issue as a matter of law if no genuine issues of material fact exist in the record.  *See Martin*, 730 S.E.2d at 166.  The plaintiff bears the burden of proving mental incapacity. *Id.*

In evaluating mental incapacity, courts may "rel[y] upon the testimony that was given by a plaintiff as to his or her own mental soundness or unsoundness." *Branch v. Carr*, 396 S.E.2d 276, 277 (Ga. Ct. App. 1990); *see Raskin v. Swann*, 454 S.E.2d 809, 810–11 (Ga. Ct. App. 1995) ("[A] plaintiff may testify as to his own mental soundness or unsoundness.").  However, "[f]or purposes of summary judgment, [a] plaintiff's claim of incompetency . . . may be rebutted by [a]

plaintiff's own testimony to the contrary, showing that there is no factual dispute as to competency." *Kohout*, 504 S.E.2d at 524; *see Martin*, 730 S.E.2d at 167 ("Martin's own testimony demonstrates that she was able to manage the ordinary affairs of life following her tragic assault.").

Courts also may rely on testimony from others, including psychiatrists, therapists, or social workers. *See, e.g.*, *Martin*, 730 S.E.2d at 167–68 (social worker who provided psychological counseling to the plaintiff); *Carter v. Glenn*, 533 S.E.2d 109, 115 (Ga. Ct. App. 2000) (plaintiff's psychiatrist). However, "diagnoses of depression, despondency, borderline personality disorder, and even PTSD, *without additional evidence that a plaintiff was unable to manage the ordinary business of life*, are mental conditions that fall short of the applicable legal standard of incompetence and, thus, are insufficient to trigger the tolling provisions." *Martin*, 730 S.E.2d at 167 (emphasis in original); *see Carter*, 533 S.E.2d at 115 (concluding that the plaintiff had not established mental incapacity in part because her treating psychiatrist "never stated an opinion that [the plaintiff] was incapacitated from managing her ordinary affairs of life"). Moreover, a professional's opinion that a plaintiff is mentally unsound can be rebutted by the professional's own testimony to the contrary or by the plaintiff's testimony. *See Martin*, 730 S.E.2d at 167–68.

10

With these standards in mind, we first review the evidence relevant to the period of alleged mental incapacity—the three-week period after Meyer's release from jail in December 2011—in the light most favorable to Meyer, the non-moving party. *See Bradley*, 739 F.3d at 608. We then consider whether there is sufficient evidence of mental incapacity to create a triable issue for the jury.

## A.

Meyer was jailed for nearly twenty months for crimes he maintains he did not commit. Due to the trauma of this experience, including physical and sexual abuse by other inmates, Meyer deteriorated both mentally and physically while in jail. He developed suicidal thoughts and began to self-mutilate. He became submissive and inhibited and felt that he was losing his identity. His thoughts began to race and he could not concentrate. By the time of his release, Meyer had lost nearly 70 pounds, though doctors could identify no physical cause for his deterioration.

Gwinnett County released Meyer from jail on December 28, 2011. At his deposition, Meyer described himself on the night of his release as a "dead man walking." His mind was racing and he could not "organize any kind of plan of action." He was paranoid about being taken back to jail, unwilling to trust that he had escaped his living nightmare.

11

After his release, Meyer borrowed a cell phone from a stranger and called a friend.  Meyer's friend picked him up, bought him food and clothing and other necessities, and then drove him to an extended stay hotel, where she paid for the room.[3]  She selected the hotel because it was close to the Brookwood Grill, a restaurant where Meyer had worked before his arrest.  She encouraged him to go back to work there.  Meyer signed over a check—representing the funds left in his inmate account upon his release—to his friend.

The next day, December 29, Meyer walked about a mile from the hotel to the Brookwood Grill.  Kevin Ives, one of the managers there, gave him money, a server's uniform, and some food.  Meyer came back the next day to fill out employment paperwork and tax withholding forms.  Another Brookwood Grill employee told Meyer what he needed to sign and fill out.  Meyer testified that he did not understand any of the documents he was signing.  Ives likewise indicated in a November 2016 affidavit that Meyer "was obviously unaware of what was going on" when he signed the documents.

According to Ives's 2016 affidavit, Meyer's demeanor in late December 2011 "was that of someone defeated and hopeless," and he seemed to be in a state of confusion and shock.  Ives testified that he would not have re-hired Meyer, or

---

[3] Meyer began paying for the room on or around January 25, 2012, after the period at issue.  He stayed at the hotel for a year and a half upon his release.

12

kept employing him, if not for his prior loyal employment and the terrible ordeal he had been through.

After he was hired, Meyer began training. Normally, according to Ives, training for a "re-hire" could be completed within two to four days. Meyer's training lasted at least two weeks because of his unstable mental condition. Ives testified that staff monitored Meyer closely during his training, and that he was dependent on help from others to get through basic tasks, like remembering menu items, entering orders in the computer system, running food to tables, and collecting money and making change. At his deposition, Meyer could not recall any specifics about the training process. Meyer also indicated that he would not have been able to perform these tasks if they had not been familiar to him from before. Coworkers reminded Meyer when he needed to show up for work.

At the end of the training period, Meyer passed a written test on the restaurant menu, which contained approximately 75 items. Ives testified that he "provided [Meyer] with an exact sheet of what items he would be tested on" to ensure he would pass. Meyer had not completed the training period before the end of the three-week period following his release.

During the relevant three weeks, Meyer was not written up or reprimanded, nor was he sent home for hygienic reasons. Again, however, Brookwood Grill made exceptions for Meyer. Ives testified that Brookwood Grill chose not to

13

reprimand Meyer because they felt sorry for him, thought that he could not help himself, and believed he would eventually re-acclimate to the job. For example, Brookwood Grill tolerated Meyer eating leftover food from customers' meals, which was ordinarily forbidden. Meyer also received instructions to keep with hygiene and appearance.

Apart from going to work, Meyer testified that he did not go to the grocery store or restaurants and that he did not socialize with anyone outside of work. He could not recall specifics about what or where he ate. He did not have a cell phone, he did not drive, he did not pay bills, he did not cook, and he did not do laundry. At best, he performed basic hygiene tasks—showering, using deodorant, brushing his teeth, and shaving—twice a week.

Meyer began treatment with Dr. Aldridge, a psychotherapist and Licensed Clinical Social Worker, in July 2012. In her affidavits, Dr. Aldridge opined that, for at least the three-week period following his release from jail, Meyer was of unsound mind and that he was incapable of managing the daily affairs of his life. According to Dr. Aldridge, Meyer developed Complex Post Traumatic Stress Disorder ("CPTSD") during his detention. Dr. Aldridge explained that CPTSD is caused by "prolonged and repeated trauma" and that it gives rise to all of the symptoms of ordinary PTSD plus additional symptoms, including difficulties in self-regulation, self-perception, and consciousness.

14

Dr. Aldridge testified that, upon his release from jail, Meyer lacked the capacity to initiate his own behavior and the judgment to make his own decisions. While he retained the function of his physical faculties, Dr. Aldridge explained, he was "basically existing on 'auto-pilot'" with "very minimal cognitive function." Due to his incarceration and his CPTSD, he was mindlessly deferential to authority and would follow the directions of the few people he trusted, such as the friend who picked him up from jail and the staff of Brookwood Grill. Dr. Aldridge explained that Meyer's act of signing the employment forms, for example, was consistent with this mindless deference to authority brought on by institutionalization. Dr. Aldridge stated that Meyer was able to engage in work and other minimal daily activities only because they were familiar to him or because he had been directed to do them by others. But his performance of these limited tasks, Dr. Aldridge stated, did not mean that he was able to manage his daily affairs.

**B.**

Construing all reasonable inferences in Meyer's favor, a reasonable jury could conclude that Meyer, during the three-month period following his release from jail, was so unsound of mind that he was unable to manage the activities of daily life. *See Martin*, 730 S.E.2d at 166.

Gwinnett County and La Petite Academy argue that Meyer is not entitled to tolling because he has not contradicted any of the actual facts of his conduct,

15

which, they assert, demonstrate that he had sufficient mental capacity to manage his daily affairs. They note that a diagnosis of PTSD alone is not sufficient to toll the limitations period without additional evidence of mental incapacity. *See id.* at 167. And they cite as evidence of Meyer's mental capacity the following facts: (a) he secured employment the day after his release; (b) he walked to and from the job on his own; (c) he filled out tax withholding forms and other documents; (d) he maintained a minimal level of hygiene and was never sent home from work because he was unpresentable; (e) he was able to feed himself; and (f) he performed various work activities, such as going through training, placing orders, remembering table numbers, and making change. In other words, as the district court succinctly summarized, Meyer "had a place to live, he lived by himself, he got food, he got a job, he got dressed, he got to work, and he got back home."

We agree that Meyer's performance of these activities tends to suggest that he had the minimal mental capacity necessary to manage his ordinary affairs, however poorly. *See Chapman*, 357 S.E.2d at 835 ("The test for mental incapacity is not whether . . . one has merely managed his affairs unsuccessfully or badly."). Nevertheless, Meyer presented contrary evidence that, despite his performance of these activities, he "was without sufficient mental capacity to . . . understand his conduct during the relevant period." *Sheats*, 273 S.E.2d at 906. It is up to a jury to resolve that conflict. *See id.* (finding summary judgment inappropriate where there

16

was a conflict between the plaintiff's deposition, "which would demand a finding that, based upon his conduct, he was not mentally incapacitated," and the plaintiff's affidavit, which "aver[red] that he was without sufficient mental capacity to perform or understand his conduct during the relevant period").

Meyer's evidence, most notably the affidavits of Dr. Aldridge and Ives, supports a reasonable inference that Meyer was so mentally unsound that he did not have the capacity to understand his conduct during the three weeks following his release. Contrary to the defendants' contentions, Meyer presented additional evidence of mental incapacity beyond a diagnosis of PTSD or CPTSD. Dr. Aldridge testified that Meyer was of unsound mind and that he was incapable of managing the daily affairs of his life, that he lacked the capacity to initiate his own behavior and the judgment to make his own decisions, and that he was able to engage in work and other minimal daily activities only because they were familiar to him and because he acted out of "mindless deference" to authority. *Cf. Sheats*, 273 S.E.2d at 906 (noting, in support of the claim of mental incapacity, that the plaintiff averred that "his Social Security checks were negotiated by him at 'someone else's urging and under their direction'"). While Meyer retained the function of his physical faculties, Dr. Aldridge explained that he was "basically existing on 'auto-pilot'" with "very minimal cognitive function." Ives's affidavit describing Meyer's functionality likewise supported this analysis. A jury crediting

17

this testimony could reasonably conclude that Meyer suffered from mental incapacity sufficient to toll the statute of limitations.

Gwinnett County and La Petite Academy maintain that Dr. Aldridge's affidavits do not create a genuine issue of material fact because, as La Petite Academy states, she never refuted "the fact that he was able to keep and maintain a job, navigate to and form said job, feed himself, and have minimal social interactions." True enough, but Dr. Aldridge testified that, despite these activities, Meyer still lacked the intellectual capacity to understand his conduct. And Ives attested that Meyer "was obviously unaware of what was going on" when he signed documents for reemployment at the Brookwood Grill, that his Meyer's demeanor in late December 2011 "was that of someone defeated and hopeless," and that Meyer seemed to be in a state of confusion and shock.

Plus, Meyer's activities were not so "numerous and complicated," *Chapman*, 357 S.E.2d at 836, that we could conclude as a matter of law that no reasonable jury could credit Dr. Aldridge's unequivocal opinions about Meyer's mental incapacity during the three weeks after his release, particularly in light of Ives's supporting affidavit. *Cf. Martin*, 730 S.E.2d at 167–68 (concluding that a social worker's "equivocal" opinion as to a plaintiff's mental incapacity had been rebutted by "significant evidence, including [the plaintiff's] own testimony, that [the plaintiff] was capable of managing the ordinary affairs of life"). Meyer

testified that he did not go to the grocery store or restaurants, he did not socialize with anyone outside of work, he did not have a cell phone, he did not drive, he did not pay bills, he did not cook, and he did not do laundry.  And Although Meyer was able to get to and from work and perform some work activities, a jury could reasonably conclude that Meyer was existing on "auto-pilot" out of prior familiarity with the tasks and mindless deference to his coworkers and managers. In this regard, Dr. Aldridge's opinions were broadly consistent with Meyer's own descriptions of his conduct (as well as with Ives's descriptions of Meyer's conduct. Finally, Meyer's ability to feed and dress himself does not add much to the balance because a "plaintiff need not be so mentally incompetent that she requires confinement or a guardian." *See id.* at 166.

Considered as a whole, Meyer has presented sufficient evidence, construing all reasonable inferences in his favor, to show that it would not be fair to charge him "with the running of the clock, because of his mental condition." *Martin*, 730 S.E.2d at 166.  Accordingly, the conflict in the evidence regarding Meyer's mental capacity is one for the jury to resolve, not the courts. *See Chapman*, 357 S.E.2d at 836–37.

## IV.

For the foregoing reasons, we conclude that a genuine issue of material fact exists in the record as to whether Meyer suffered mental incapacity sufficient to

19

toll the statute of limitations during the three-week period following his release from jail. *See* O.C.G.A. §§ 9-3-90, 9-3-91. Because that additional three weeks would render Meyer's complaint timely filed within two years of the date of his release, the date the district court used to determine timeliness, we vacate the grant of summary judgment and remand for proceedings consistent with this opinion.

**VACATED AND REMANDED.**