[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 19-13181

_____

ROSS M. JACKSON,

Plaintiff-Appellant,

*versus*

SGT GLENN COWAN,
University of Georgia Police Department,
SPO K DORSEY,
University of Georgia Police Department,
OFC HUTCHINS,
University of Georgia Police Department,

Defendants-Appellees,

2                    Opinion of the Court                    19-13181

KEATON WILLIAM LAW, et. al.,

                                                        Defendants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:17-cv-00145-CDL

_____

Before JORDAN, LAGOA, and BRASHER, Circuit Judges.

PER CURIAM:

Ross Jackson preaches Biblical Christianity in public places. While he was delivering a sermon at the University of Georgia, he was arrested for simple battery of a student who was countering his message.

Mr. Jackson filed suit against several UGA police officers—Sergeant Glenn Cowan, Officer Kevin Dorsey, and Officer Oksana Hutchins—alleging claims under 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments and a claim under 42 U.S.C. § 1985(3). The officers moved for summary judgment based on qualified immunity. After concluding that the officers were entitled to qualified immunity, the district court entered summary judgment in their favor. After reviewing the record and with the benefit of oral argument, we affirm.

# I[1]

On October 10, 2016, Mr. Jackson, who is black, and three white preachers delivered sermons on UGA's Tate Lawn, a designated free expression area on UGA's campus. A free expression area at UGA is an area for individuals to exercise their First Amendment rights without obtaining a permit from UGA.

Mr. Jackson preached first for approximately thirty to sixty minutes, followed by the three white preachers. In delivering their sermons, the preachers expressed controversial religious views, and a large crowd of students surrounded the preachers. After arriving on the scene, UGA police officers, including the officers sued here, stood behind the crowd of students, monitored the situation, and answered questions from the students. In response to student questions about how to silence the preachers, the officers repeatedly explained that they could not intervene because the preachers had the constitutional right to freedom of speech.

After the UGA officers had been on the scene for approximately forty-two minutes, the crowd of students audibly reacted to one of the white preachers. The officers moved into the crowd, and Officer Dorsey asked, "What just happened? Did someone touch him?" A small group of students was up close to a preacher,

---

[1] The record evidence in this case includes the body camera video recordings of Officer Dorsey and Sergeant Cowan, which captured the events that transpired on October 10 and October 11, 2016, respectively, on UGA's Tate Lawn.

with some students holding each other back. The officers asked the students to move away from the preacher and back into the crowd. One student remained close to the preacher, however, and the officers physically moved her back. Officer Dorsey informed one student that the preachers' goal was to "upset" them and said not to touch them.[2]

The officers then remained in the front of the crowd for approximately eight minutes. During this time, several students got close to the preacher, but the officers did not intervene. They continued to explain to students that the preacher had freedom of speech under the First Amendment so long as "he doesn't threaten someone or put his hands on someone." Officer Dorsey told a student that the officers' "whole goal is to make sure that no on touches him and he doesn't touch anyone else and he doesn't threaten someone." At one point, the student who was previously moved away from the preacher came up and spoke with the officers. The officers explained to her that she could "say whatever [she] want[s], . . . just don't threaten him." Shortly after, the officers went back behind the crowd of students.

A few minutes later, there was another reaction from the crowd, and the officers moved back into the crowd. They spoke to a student who the preacher had insulted, with Officer Dorsey

---

[2] This was not the first time that the crowd audibly reacted, but it was the first time shown in the video where the reaction led officers to move into the crowd.

saying, "We just wanted to make sure you were okay." Then, the officers went back behind the crowd. About six minutes later, the officers moved back in and broke up a group of students surrounding the preacher. Officer Dorsey explained to a student that "they can say whatever they want," but if the preacher "attacks someone, touches someone, or threatens someone, like their safety, then that's an issue, then we can step in." The student asked, "Really?" and Officer Dorsey responded, "Just like you could say anything you want. I mean, as long as you don't touch him, as long as you don't like threaten him or anything. . . . As long as everyone just maintains their distance and doesn't threaten them or anything, then it's okay." At that point, a woman started aggressively engaging with one of the preachers; officers stepped between them and created distance but allowed the woman to continue to engage while the officer stood between them. After she moved back, an officer stopped and spoke to her. This woman continued to interact with the preachers for the next half hour without further police intervention.

The officers briefly moved back, but then returned to the front of the crowd. The officers made no further physical interventions, although some students held or moved each other back. When a student was upset at a preacher's comments that "all Muslims are a cancer," Officer Dorsey once again explained, "He can say whatever he wants. You can say whatever you want as well, as long as you don't touch him or threaten him. And that's the First

Amendment." The video evidence does not show any further police intervention that day.[3]

Mr. Jackson returned to Tate Lawn the next day. When Sergeant Cowan arrived at the scene on the second day, the crowd gathered around Mr. Jackson was significantly sparser than it was the day before.

UGA students Keaton Law and Lechandt Opperman were aggressively engaging with Mr. Jackson. Sergeant Cowan stood back and monitored the situation for about twelve minutes. At that point, Officer Dorsey arrived and started to separate Mr. Jackson and Mr. Law, but Sergeant Cowan called Officer Dorsey back. Mr. Law told the officers, "I promise not to touch him at all," to which Sergeant Cowan responded, "I know." Officer Dorsey said to Sergeant Cowan that "it just kind of looked like [Mr. Law] was all up in [Mr. Jackson's] face." Sergeant Cowan responded that "they're countering what he's saying" and that Officer Dorsey should not say anything and should refer all questions to him.

Sergeant Cowan said that Mr. Law and Mr. Opperman were "doing a really good job" countering Mr. Jackson's speech. Officer Dorsey apologized and said that he "didn't know [Sergeant Cowan] had already talked to" Mr. Law and Mr. Opperman. Sergeant Cowan later testified that he remembered explaining to a group of

---

[3] We note, however, that the video ends as new officers arrive, while the crowd was still gathered and the preachers were still preaching.

students, including Mr. Law, the day before that they could engage in counter-speech and that they had the same rights as the preachers.

Mr. Jackson, Mr. Law, and Mr. Opperman continued their heated exchange for about seven minutes. During this period, Sergeant Cowan stood behind the sparser crowd and responded to student questions. For example, he told a student that Mr. Jackson's preaching was to get somebody to react to him, e.g., by striking him, and was "not real religion."

At one point during his exchange with Mr. Law, Mr. Jackson "felt [Mr. Law's] spit touch" him when Mr. Law shouted in his ear. Mr. Jackson then approached the officers, who were responding to student questions, and asked if it was okay for the students to "put his mouth right up on his ear and yell." Cowan brushed off the question, and the students and Mr. Jackson returned to the center of the circle. Mr. Jackson and Mr. Law continued to yell at each other, sometimes in each other's faces and sometimes farther apart. On several occasions, Mr. Jackson raised his arms while holding a Bible and yelled at Mr. Law to "back up." According to Mr. Jackson, Mr. Law "chest-bumped" him as the exchange escalated. From the video footage, Mr. Jackson and Mr. Law were positioned very close to one another during this point of the exchange; the video depicts Mr. Law moving his chest closely to Mr. Jackson's chest but does not clearly depict whether the two bumped chests.

The exchange continued, and when they were close together, Mr. Jackson backed up from Mr. Law and told him, "You

need a breath mint." Mr. Law responded, "I do, and I hope it smells," while walking toward Mr. Jackson. Mr. Jackson raised his arms while holding his Bible like he had done in the minutes before.

At the same time, Mr. Law moved even closer and stepped to Mr. Jackson's left side. Mr. Jackson lifted his left arm across his own body and made contact with Mr. Law's face. After touching Mr. Law, Mr. Jackson continued moving him to the side, saying, "Out of my face." Officer Dorsey said, "He just pushed him," and the officers moved in and arrested Mr. Jackson for simple battery. Sergeant Cowan told Mr. Jackson that he was under arrest for simple battery and asked Mr. Jackson if he understood. Mr. Jackson responded that he did not "make any intentional physical conduct," but Sergeant Cowan stated that was what he and the other officers observed and recorded.

Later, when Sergeant Cowan was briefing an investigating officer on the incident, he stated that Mr. Jackson was "berating" Mr. Law, that Mr. Law at one point came around to Mr. Jackson's side, that Mr. Jackson hit the side of Mr. Law's shoulder and head, and that "at that point [they] took him down." Sergeant Cowan concluded the briefing by stating, "Crowd went crazy. I think we hit a home run."

The state declined to prosecute Mr. Jackson. Prosecutors concluded that while "there was sufficient probable cause to arrest [him], the evidence is not sufficient to prove guilt beyond a reasonable doubt."

Mr. Jackson filed suit against the officers, Mr. Law, and Mr. Opperman, asserting claims under § 1983 for violations of the First, Fourth, and Fourteenth Amendments, and a claim under § 1985(3). The officers moved for summary judgment, arguing that Mr. Jackson's claims failed as a matter of law and that they were entitled to qualified immunity.

The district court granted summary judgment in favor of the officers. The district court concluded that the claims of false arrest under the Fourth Amendment and retaliatory arrest under the First Amendment failed because there was probable cause to arrest Mr. Jackson for simple battery, which is an absolute bar to challenging an arrest. The district court reasoned that an objective officer could reasonably conclude that Mr. Jackson's physical contact with Mr. Law was "intentional and insulting or of a provoking nature" so as to constitute simple battery under Georgia law. *See* Ga. Code Ann. § 16-5-23(a)(1) (2016). The district court therefore ruled that the officers were entitled to qualified immunity on those claims.

As to Mr. Jackson's claim that the officers failed to intervene to protect his First Amendment rights, the district court concluded that the officers did nothing to impede his speech prior to his arrest and that there was no clearly established law requiring officers to prevent third parties from obstructing speech. The district court also rejected Mr. Jackson's claim under the Fourteenth Amendment that the officers were more protective of the white preachers on the first day than they were of him on the second day. The two days of preaching were not similar in all relevant respects, as there

were material differences in crowd size and how the students in the crowd behaved on each day. The district court thus ruled that the officers were entitled to qualified immunity on Mr. Jackson's Equal Protection claim.

Finally, the district court concluded that Mr. Jackson's § 1985(3) conspiracy claim failed because there was no evidence that the officers were motivated by race- or class-based animus. And it explained that the officers were likely protected from this claim by qualified immunity as well.

This appeal ensued.

## II

We review de novo summary judgment decisions based on qualified immunity. *See Glasscox v. City of Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018). "When considering a motion for summary judgment, including one asserting qualified immunity, 'courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, they must credit the nonmoving party's version.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (alteration adopted) (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)). "Summary judgment is appropriate only when the moving party demonstrates that no disputed issue of material fact exists," and that it is entitled to judgment as a matter of law. *See Carter v. Butts Cnty.*, 821 F.3d 1310, 1318 (11th Cir. 2016). If there is video evidence that

"obviously contradicts [the plaintiff's] version of the facts, we accept the video's depiction instead of [the plaintiff's] account." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010).

## III

On appeal, Mr. Jackson contends that the district court erred in granting summary judgment in favor of the officers on all his claims. To recap, Mr. Jackson asserted four claims under 42 U.S.C. § 1983, arguing that the officers violated his constitutional rights (1) under the Fourth Amendment, by arresting him without probable cause; (2) under the First Amendment, by arresting him because of the content of his speech; (3) under the First Amendment, by failing to intervene to protect him while he was exercising his right to free speech; and (4) under the Fourteenth Amendment's Equal Protection Clause, by offering him less protection on the second day than they offered the white preachers on the first day. Mr. Jackson also brought a claim under 42 U.S.C. § 1985(3), contending that the officers conspired with Mr. Law and Mr. Opperman to deprive him "of his equal protection of the law and equal privileges and immunities." We first discuss the relevant legal principles governing qualified immunity before turning to Mr. Jackson's claims.

## A

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "[Q]ualified immunity is a privilege that provides 'an *immunity from suit* rather than a mere defense to liability.'" *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (alteration and emphasis in original) (quoting *Bates v. Harvey*, 518 F.3d 1233, 1242 (11th Cir. 2008)).

In order to be entitled to qualified immunity, an officer must first show that he was acting within his discretionary authority. *See Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018). Because that threshold question is undisputed here, "the burden shifts to [Mr. Jackson] to establish that qualified immunity is not appropriate by showing that (1) the facts alleged make out a violation of a constitutional right and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct." *Gates v. Khokhar*, 884 F.3d 1290, 1297 (11th Cir. 2018). We have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

In determining whether a principle of law is clearly established, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional

question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The "salient question" in a qualified immunity analysis is whether officers had "fair warning" that their conduct was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (rejecting requirement that plaintiffs must identify a case with "fundamentally" or "materially similar" facts to show that the law is clearly established because "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). Accordingly, a plaintiff may demonstrate clearly established law in one of three ways. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). "First, he can show that a materially similar case has already been decided." *Id.* Second, he can "show that a broader, clearly established principle should control the novel facts" of his case. *Id.* Third, "he [can] show that [his] case fits within the exception of conduct which so obviously violates [the] [C]onstitution that prior case law is unnecessary." *Id.*

**B**

Mr. Jackson contends that he was arrested without probable cause in violation of the Fourth Amendment. "[I]t is well established that '[a] warrantless arrest without probable cause violates the Fourth Amendment and forms the basis for a [§] 1983 claim.'" *Carter*, 821 F.3d at 1319 (second alteration in original) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996)). "[B]ut the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). Moreover,

"[t]o receive qualified immunity, an officer need not have actual probable cause, but only arguable probable cause," meaning "reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendants could have believed that probable cause existed to arrest [the] [p]laintiff." *Id.* (quotation marks omitted).

"For probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). Although an officer "'is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest,'" the officer "may not choose to ignore information that has been offered to him or her . . . or elect not to obtain easily discoverable facts." *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)), *abrogated on other grounds by Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020). "[W]e apply this objective reasonableness standard to the facts as they relate to the elements of the alleged crime for which the plaintiff was arrested." *Carter*, 821 F.3d at 1320; *see also Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333 (11th Cir. 2004) ("Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify an arrest for a particular crime depends, of course, on the elements of the crime.").

Although arguable probable cause does not "require proving every element of a crime," qualified immunity is not appropriate when a reasonable officer, based on readily available

information, would have known that the plaintiff's conduct did not satisfy an element of the offense. *See Brown*, 608 F.3d at 735; *Carter*, 821 F.3d at 1321. Our decision in *Carter* provides a good example of how these concepts work.

In *Carter*, an officer arrested maintenance workers who were clearing out his abandoned, foreclosed-upon house after being authorized to do by their company. *See* 821 F.3d at 1315–18. The officer argued that he had probable cause to arrest the workers for burglary, criminal trespass, and theft by taking. *Id.* at 1320. We analyzed the elements of the relevant statutes and explained that "[t]he common thread running through all of these offenses is a lack of authority," i.e., a lack of authority to be at or inside a property or a lack of authority to remove a property's contents. *See id.* Therefore, whether the officer had arguable probable cause to arrest the workers "necessarily focuse[d] on whether a reasonable officer in [the defendant officer's] position should have known that [the workers] were authorized to prepare the [p]roperty for sale following the foreclosure." *Id.* at 1320–21. We held that the officer "lacked even arguable probable cause" because "a reasonable officer should have known both that [the p]laintiffs were authorized to enter the [p]roperty and . . . to remove its contents." *Id.* at 1321. Indeed, the officer was aware that the resale company was authorized to enter and clean out his property before and at the time of the workers' arrests. *Id.* We explained that the officer's refusal to look at authorization documentation did not "excuse any ignorance" he claimed to have, as "[a] police officer may not conduct

an investigation in a biased fashion[,] . . . elect not to obtain easily discoverable facts,'" nor "choose to ignore information that has been offered to him or her." *Id.* (quotation marks omitted). A jury, we said, could reasonably conclude that the officer arrested the workers to retaliate against them for the lawful foreclosure against his abandoned property. *See id.* at 1322.

Here Mr. Jackson was arrested for simple battery. Georgia's simple battery statute provides that "[a] person commits the offense of simple battery when he or she either: (1) Intentionally makes physical contact of an insulting or provoking nature with the person of another; or (2) Intentionally causes physical harm to another." Ga. Code Ann. § 16-5-23(a) (2016). As the unambiguous text of the statute makes clear, accidental or unintentional conduct cannot form the basis of a charge of simple battery. Indeed, the Georgia Supreme has noted that "[i]f the jury believed that an accident occurred, no battery was committed" under § 16-5-23(a). *See Moore v. State*, 656 S.E.2d 796, 799–800 (Ga. 2008). Moreover, in considering this same statute, we held in *United States v. Griffith*, 455 F.3d 1339 (11th Cir. 2006), that § 16-5-23(a)(1) is a predicate offense under 18 U.S.C. § 922(g)(9), which prohibits someone who has been convicted of "a misdemeanor crime of domestic violence" from possessing firearms. We explained that Georgia's simple battery statute has an element of "'physical contact of an insulting or provoking nature'" and that "[a] person cannot make physical contact—particularly of an insulting or provoking nature—with

another without exerting some level of physical force." *Griffith*, 455 F.3d at 1342 (quoting § 16-5-23(a)(1)).

Even considering the facts in the light most favorable to Mr. Jackson—as we must at the summary judgment stage—the officers were entitled to qualified immunity. As we explain, the officers had arguable probable cause to arrest Mr. Jackson for simple battery.

The video evidence shows Mr. Jackson repeatedly raising his arms while holding a Bible without making physical contact with Mr. Law. But when Mr. Law moved toward Mr. Jackson's side while Mr. Jackson was simultaneously raising his arms with his Bible in hand, physical contact took place. Under those circumstances, we acknowledge that it was not crystal-clear that Mr. Jackson acted intentionally or in an insulting or provoking way. But given the confrontation and animosity between Mr. Jackson and Mr. Law, a reasonable officer objectively "could have believed" that Mr. Jackson acted intentionally or in an insulting or provoking manner by touching Mr. Law's face with his arm. And that is all that is required for arguable probable cause to exist. *See Brown*, 608 F.3d at 734.

After the arrest, Sergeant Cowan explained to an investigating officer that Mr. Jackson had "brushed his arm up against" Mr. Law. This characterization of the touching, however, does not negate the existence of arguable probable cause or create an issue of material fact. For example, the following exchange—captured on video—occurred during Mr. Jackson's arrest:

18                    Opinion of the Court                    19-13181

> COWAN: You're under arrest for simple battery, do
> you understand?
>
> . . .
>
> COWAN: You cannot make intentional physical con-
> tact with anybody.  Do you understand that?
>
> JACKSON: I didn't make any intentional physical
> contact.
>
> COWAN:  Yes, sir, but that's what we observed and
> that's what we have recorded, sir.  Okay.

Taking Sergeant Cowan's contemporaneous and post-arrest statements together, and viewing them in the light most favorable to Mr. Jackson, our conclusion about arguable probable cause remains the same.  As we and some of our sister circuits have explained, officers are given latitude when making on-the-spot determinations about a suspect's intent or mens rea. *See Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007); *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004); *Paff v. Kaltenbach*, 204 F.3d 425, 437 (3d Cir. 2000).  "The concept of arguable probable cause . . . allows for the possibility that an officer might 'reasonably but mistakenly conclude that probable cause is present,'" and "'does not require proving every element of a crime.'" *Gates*, 884 F.3d at 1298–1300 (citations omitted).  *See also District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) ("Even assuming the officers lacked actual probable cause to arrest the partygoers, the officers are entitled to qualified

immunity because they ʻreasonably but mistakenly conclude[d] that probable cause [wa]s present.ʼ") (citation omitted).[4]

## C

Mr. Jackson contends that the officers violated the First Amendment by arresting him based on the content of his speech. As an initial matter, we agree with the district court's determination that, at the time of Mr. Jackson's arrest, it was the law of this circuit that the existence of probable cause barred a First Amendment retaliatory arrest claim. *See Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002) ("[T]he existence of probable cause . . . defeats [a] First Amendment [retaliation] claim."), *abrogated by Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018); *Gates*, 884 F.3d at 1297–98 (probable cause defeats a false arrest claim). Subsequently, in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), the Supreme Court held that though generally a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest," there is an exception to "the no-probable-cause requirement . . . when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1724, 1727. Because this exception was announced when *Nieves* was decided,

---

[4] Even if we were to consider Mr. Jackson's post-arrest denial of intentional contact, an officer is not required to accept a suspect's protestations of innocence. *See Wesby*, 138 S. Ct. at 587–88.

it was not clearly established law in this circuit at the time of Mr. Jackson's arrest.

As previously discussed, the officers had arguable probable cause to arrest Mr. Jackson for simple battery. Given the law of our circuit at the time, the officers are entitled to qualified immunity for the First Amendment claim. Mr. Jackson argues that, because the Supreme Court applied the probable cause exception retroactively in *Nieves*, we should do so here. He fails to note, however, that in the Ninth Circuit prior to *Nieves* "a plaintiff [could] prevail on a First Amendment retaliatory arrest claim even in the face of probable cause for the arrest." *Nieves*, 139 S. Ct. at 1721. That was not the law in this circuit. Indeed, the Supreme Court in *Nieves* rejected the Ninth Circuit's approach, holding that "[a]bsent . . . a showing [of no probable cause], a retaliatory arrest claim fails," subject only to the "narrow qualification" discussed above. *Id.* at 1725, 1727.

Additionally, *Lozman*—the other case Mr. Jackson relies on for his retroactivity argument—was similarly decided after his arrest. In any event, in *Lozman* the Supreme Court explicitly limited its holding to suits against governmental entities, which are not entitled to qualified immunity. *See* 138 S. Ct. at 1954–55 (noting that because the defendant was a city rather than a governmental officer, the plaintiff was required to "prove the existence and enforcement of an official policy motivated by retaliation," which "separate[d] [the plaintiff's] claim from the typical retaliatory arrest

claim," and declining to "address the elements required to prove a retaliatory arrest claim in other contexts").

## D

Mr. Jackson asserts that the officers had a duty to intervene to prevent Mr. Law and Mr. Opperman from drowning out his speech. He argues that the officers encouraged the obstruction, effectively subjecting him to a heckler's veto.

A heckler's veto occurs when unpopular speakers are "convicted upon evidence which show[s] no more than that the opinions which they were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection." *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963). Such convictions "may not stand." *Id.* at 238 (quoting *Terminiello v. Chicago*, 337 U.S. 1, 5 (1949)); *see also Gregory v. City of Chicago*, 394 U.S. 111, 111–12 (1969) (reversing convictions of peaceful protestors for disorderly conduct after "onlookers became unruly" and "police, to prevent what they regarded as an impending civil disorder, demanded that the demonstrators, upon pain of arrest, disperse"); *Cox v. Louisiana*, 379 U.S. 536, 545–51 (1965) (reversing convictions for breach of the peace where officers ordered peaceful protestors to disperse because "violence was about to erupt" from counter-protestors).

In each of these heckler's veto cases, police ordered unpopular, but peaceful, protestors to disperse because they were concerned that counter-protestors were about to become violent.

When the peaceful protestors refused to disperse, they were arrested.

The heckler's veto principle prohibits police from arresting peaceful protestors, or ordering them to disperse, in acquiescence to unruly counter-protestors. Some circuits have held or suggested that police officers have a duty to take reasonable actions to protect, against violence, persons exercising their First Amendment rights. *See, e.g.,* *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 252–53 (6th Cir. 2015) (en banc); *Phelps-Roper v. Ricketts*, 867 F.3d 883, 900–01 (8th Cir. 2017). Others, however, have concluded that officers can ask speakers to move to another location in order to prevent violence as long as their actions are not based on the content of the speech. *See Startzell v. City of Philadelphia*, 533 F.3d 183, 200–01 (3d Cir. 2008). As far as we can tell, however, no court has ruled that the heckler's veto principle requires officers to protect a speaker from counter speech. Here, Mr. Jackson was never ordered to disperse, and the basis for his arrest was not the students' reaction to his unpopular speech, but rather the physical contact between himself and Mr. Law. This is therefore not a heckler's veto case. Accordingly, we affirm the district court's rejection of this claim on qualified immunity grounds.[5]

---

[5] Mr. Jackson asserts that internal UGA policies required the officers to intervene. The relevant question under § 1983, however, is whether the officers violated Mr. Jackson's First Amendment rights, not internal policies. *See Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional

E

Mr. Jackson's fourth and final § 1983 claim was brought under the Fourteenth Amendment's Equal Protection Clause. Mr. Jackson argues that the officers engaged in racial discrimination because they provided more protection to the white preachers on the first day than they provided to him on the second day.

"[T]he Equal Protection Clause requires government entities to treat similarly situated people alike." *Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006). "To prevail on [a] traditional type of equal protection claim, basically a selective enforcement claim, . . . [a plaintiff] must show . . . that [he was] treated differently from other similarly situated individuals." *Id.* at 1314. "[D]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *Id.* (quoting *E&T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)).

Here, the district court correctly identified several material differences between the first day and the second day that preclude Mr. Jackson's race discrimination claim. Two are particularly compelling. First, on the first day, the crowd of students was significantly larger and blocked the officers' view. The officers intervened when they heard the crowd react but could not see what was going on inside the circle. On the second day, the officers had better visibility, and there was less crowd reaction. Second, on the

violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.").

first day, the officers separated several students from the preachers; the officers had not yet explained to those students that they could engage in counter-speech but could not touch the preachers. Notably, after the officers had a conversation with a woman who was aggressively debating a white preacher, they allowed her to continue to engage without further police intervention. On the second day, Sergeant Cowan remembered that he had already explained this to Mr. Law, and video evidence shows Mr. Law promising the officers that he would not touch Mr. Jackson.

In short, the conditions on the first day differed from those of the second day such that the first day is not an adequate comparator. The officers' treatment of Mr. Jackson and handling of the students may not have been optimal, but he has failed to show that it was based on race discrimination. We therefore affirm the district court's rejection of this claim on qualified immunity grounds.

## F

Mr. Jackson claimed that the officers engaged in a conspiracy in violation of § 1985(3). That provision prohibits "two or more persons" from "conspir[ing] . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protections of the laws."[6]

---

[6] Previously in this circuit, qualified immunity was not available as a defense to § 1985(3) claims. *See Burrell v. Bd. of Trs. of Ga. Mil. Coll.*, 970 F.2d 785, 794 (11th Cir. 1992). Subsequently, however, the Supreme Court has applied qualified immunity to § 1985(3) claims. *See Ziglar v. Abbasi*, 137 S. Ct. 1843,

To prevail on a § 1985(3) claim, a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protections of the laws, or of equal
privileges and immunities under the laws; and (3) an
act in furtherance of the conspiracy; (4) whereby a
person is either injured in his person or property or
deprived of any right or privilege of a citizen of the
United States.

*United Brotherhood of Carpenters & Joiners of Am. v. Scott*, 463
U.S. 825, 828–29 (1983).

The first element of a § 1985(3) claim is a conspiracy, i.e., "an
agreement between 'two or more persons' to deprive him of his
civil rights." *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761,
767 (11th Cir. 2000) (quoting § 1985(3)). For example, in *Adickes
v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970), the Supreme
Court concluded that, based on "unexplained gaps in the materials
submitted" at the summary judgment stage, the respondent failed
to demonstrate that no policeman was in the store, which was a
"critical element" in determining whether a conspiracy to refuse
service occurred.

---

1869 (2017) ("Petitioners are entitled to qualified immunity with respect to the
claims under 42 U.S.C. § 1985(3)."); *see also Chua v. Ekonomou*, 1 F.4th 948,
956 (11th Cir. 2021) (recognizing that the Supreme Court in *Ziglar* abrogated
*Burrell*'s holding that "qualified immunity does not apply to a claim brought
under [§] 1985(3)").

Only one of Mr. Jackson's allegations could plausibly indicate such an agreement—that "[Mr.] Law asked [Dean Janice] Barham the day before how to shut Mr. Jackson down, and [Mr.] Law then spoke with [Sergeant] Cowan." But the record evidence does not support this allegation. Dean Barham testified that on the first day of preaching, Mr. Law was "engaging in conversation, the same questions that most of our students were asking, 'Why are they able to be here? What are they doing? How do we shut this down?'" Dean Barham was generalizing the questions that most students were asking, not directly quoting Mr. Law. Furthermore, the video footage demonstrates that when students did ask questions—along the lines of "how do we shut this down"—the officers responded that they could not interfere with the preachers' freedom of speech and that the best course of action was for students to walk away or engage in counter-speech.

Sergeant Cowan also testified that he did not speak directly to Mr. Law. Rather, Mr. Law was standing in a group of students, and Sergeant Cowan spoke with other members of the group. Our review of the video indicates that Sergeant Cowan did not come to an agreement or understanding with any of the students but simply informed them of their right to engage in counter-speech. Mr. Jackson did not present any evidence that contradicts Dean Barham's or Sergeant Cowan's testimony on these issues. And, unlike *Adickes*, there are no "unexplained gaps" in the evidence here. *See* 398 U.S. at 158.

After reviewing all the video footage and the extensive deposition testimony, there is simply no evidence that the officers reached an agreement with their co-defendants to deprive Mr. Jackson of his rights. We therefore affirm the dismissal of Mr. Jackson's § 1985(3) claim for failure to establish a factual dispute as to whether a conspiracy existed.

## IV

We affirm the district court's summary judgment order.

**AFFIRMED.**

19-13181   LAGOA, J., Concurring in Part, Dissenting in Part      1

LAGOA, Circuit Judge, Concurring in Part and Dissenting in Part:

I concur with the majority's rulings to affirm the district court's denial of Ross Jackson's claims against Appellees for: (1) failing to intervene to protect Jackson while he was exercising his right to free speech; (2) engaging in racial discrimination in violation of the Fourteenth Amendment's Equal Protection Clause by providing more protection to white preachers on the first day of preaching than him on the second day; and (3) conspiracy in violation of 42 U.S.C. § 1985(3).

However, I part ways with the majority's affirmance of the district court's denial of Jackson's 42 U.S.C. § 1983 claims for false arrest under the Fourth Amendment and retaliatory arrest under the First Amendment.  In my view, when viewing the record evidence in the light most favorable to Jackson—as we must at the summary judgment stage—no reasonable officer with the same knowledge as Appellees would have concluded that Jackson's contact with Keaton Law was intentional such that Appellees had probable cause or arguable probable cause to arrest Jackson for simple battery.  Therefore, I would reverse the district court's determination that Appellees are entitled to qualified immunity as to Jackson's false arrest and retaliatory arrest claims.  And, as to the substance of Jackson's retaliatory arrest claim, I would conclude that the evidence, when viewed in the light most favorable to Jackson, shows that Appellees had a disparate reaction to similar levels of aggression from Jackson and Law such that a genuine dispute of

material fact exists as to whether Jackson's arrest was motivated by Appellees' animosity toward the content of his speech.

## I.       Qualified Immunity Principles

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "[Q]ualified immunity is a privilege that provides 'an *immunity from suit* rather than a mere defense to liability.'" *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (alteration and emphasis in original) (quoting *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)).

In order to be entitled to qualified immunity, an officer must first show that he was acting within his discretionary authority. *Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018). Because that threshold question is undisputed here, "the burden shifts to the plaintiff to establish that qualified immunity is not appropriate by showing that (1) the facts alleged make out a violation of a constitutional right and (2) the constitutional right at issue was clearly established at the time of the alleged misconduct." *Gates v. Khokhar*, 884 F.3d 1290, 1297 (11th Cir. 2018). This Court has

19-13181    LAGOA, J., Concurring in Part, Dissenting in Part        3

"discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

In determining whether a law is clearly established, this Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The "salient question" in a qualified immunity analysis is whether officers had "fair warning" that their conduct was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (rejecting requirement that plaintiffs must identify a case with "fundamentally" or "materially similar" facts to show that a law is clearly established because "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). Accordingly, a plaintiff in this Circuit may demonstrate clearly established law in one of three ways. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). "First, he can show that a materially similar case has already been decided." *Id.* Second, he can "show that a broader, clearly established principle should control the novel facts" of his case. *Id.* Third, "he could show that [his] case fits within the exception of conduct which so obviously violates [the] [C]onstitution that prior case law is unnecessary." *Id.*

## II.    False Arrest Claim

On appeal, Jackson contends that he was arrested without probable cause in violation of the Fourth Amendment. "[I]t is well established that '[a] warrantless arrest without probable cause

4      LAGOA, J., Concurring in Part, Dissenting in Part     19-13181

violates the Fourth Amendment and forms the basis for a section 1983 claim.'" *Carter*, 821 F.3d at 1319 (second alteration in original) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996)); *accord Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). "[B]ut the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." *Brown*, 608 F.3d at 734. Moreover, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause," meaning "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest [the] Plaintiff." *Id.* (quoting *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)).

"For probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). While an officer "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," the officer "may not choose to ignore information that has been offered to him or her . . . or elect not to obtain easily discoverable facts." *Kingsland*, 382 F.3d at 1229 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)), *abrogated on other grounds by Williams v. Aguirre*, 965 F.3d 1147 (11th Cir. 2020). This Court applies "this objective reasonableness standard to the facts as they relate to the elements of the alleged crime for which the plaintiff was arrested." *Carter*, 821 F.3d at 1320; *see also Crosby v. Monroe County*, 394

19-13181   LAGOA, J., Concurring in Part, Dissenting in Part        5

F.3d 1328, 1333 (11th Cir. 2004) ("Whether a particular set of facts gives rise to probable or arguable probable cause to justify an arrest for a particular crime depends, of course, on the elements of the crime.").

Although probable cause does not "require proving every element of a crime," qualified immunity is not appropriate when a reasonable officer, based on readily available information, would have known that the plaintiff's conduct did not satisfy an element of the offense. *See Brown*, 608 F.3d at 735; *Carter*, 821 F.3d at 1321. For example, in *Carter*, an officer arrested maintenance workers who were clearing out the officer's abandoned, foreclosed-upon house after being authorized to do by their company. *See* 821 F.3d at 1315–18. The officer argued that he had probable cause to arrest the workers for burglary, criminal trespass, and theft by taking. *Id.* at 1320. This Court analyzed the elements of the relevant statutes and explained that "[t]he common thread running through all of these offenses is a lack of authority," i.e., a lack of authority to be at or inside a property or a lack of authority to remove a property's contents. *Id.* Therefore, whether the officer had arguable probable cause to arrest the workers "necessarily focuse[d] on whether a reasonable officer in [the defendant officer's] position should have known that [the workers] were authorized to prepare the Property for sale following the foreclosure." *Id.* at 1320–21. This Court held that the officer "lacked even arguable probable cause" because "a reasonable officer should have known both that Plaintiffs were authorized to enter the Property and . . . to remove its contents." *Id.*

6        LAGOA, J., Concurring in Part, Dissenting in Part      19-13181

at 1321.  Indeed, the officer was aware that the resale company was authorized to enter and clean out the officer's property before and at the time of the workers' arrests.  *Id.*  This Court explained that the officer's refusal to look at authorization documentation did not "excuse any ignorance" he claimed to have, as "[a] police officer may not 'conduct an investigation in a biased fashion[,] . . . elect not to obtain easily discoverable facts," nor "choose to ignore information that has been offered to him or her." *Id.* (quoting *Kingsland*, 382 F.3d at 1229).  And this Court explained that a jury could reasonably conclude that the officer arrested the workers to retaliate against them for the lawful foreclosure against the officer's abandoned property.  *See id.* at 1322.

Turning to this case, Jackson was arrested for simple battery. Georgia's simple battery statute provides that "[a] person commits the offense of simple battery when he or she either: (1) Intentionally makes physical contact of an insulting or provoking nature with the person of another; or (2) Intentionally causes physical harm to another." Ga. Code Ann. § 16-5-23(a) (2016).  As the unambiguous text of the statute makes clear, accidental or unintentional conduct cannot form the basis of a charge of simple battery. Indeed, the Georgia Supreme has noted that "[i]f the jury believed that an accident occurred, no battery was committed" under section 16-5-23(a).  *See Moore v. State*, 656 S.E.2d 796, 799–800 (Ga. 2008).  Moreover, in considering this same statute, this Court in *United States v. Griffith*, 455 F.3d 1339, 1340–46 (11th Cir. 2006), held that section 16-5-23(a)(1) is a predicate offense under 18 U.S.C.

§ 922(g)(9), which prohibits someone who has been convicted of "a misdemeanor crime of domestic violence" from possessing firearms.  This Court explained that Georgia's simple battery statute "has an element [of] 'physical contact of an insulting nature'" and that "[a] person cannot make physical contact—particularly of an insulting or provoking nature—with another without exerting some level of physical force." *Griffith*, 455 F.3d at 1342 (quoting § 16-5-23(a)(1)).

Considering the facts in the light most favorable to Jackson—as we must at the summary judgment stage—Jackson did not intentionally use physical force of an insulting or a provoking nature against Law.  The video evidence shows Jackson repeatedly raising his arms while holding a Bible without making physical contact with Law.  Only when Law moved toward Jackson's side while Jackson was simultaneous raising his arms with his Bible in hand did physical contact occur.  Under those circumstances, it was not reasonable to conclude that Jackson intentionally made physical contact of an insulting or provoking nature with Law.  Rather, as the video evidence shows, Jackson was raising his Bible, as he had done multiple times before, when Law—who was already close to Jackson—moved even closer to Jackson's side such that physical contact between the two occurred.  Further, Appellees' own contemporaneous words, when viewed in the light most favorable to Jackson, further confirm that Appellees perceived the contact as slight and unintentional.  Specifically, on video after the arrest, Sergeant Cowan explained to an investigating officer that Jackson

"brushed his arm up against" Law. Significantly, Sergeant Cowan knew that the law required an intentional touching as an element for an arrest of simple battery.

No reasonable officer with the same knowledge as Appellees would have concluded that Jackson's contact with Law was intentional. I therefore conclude that on this summary judgement record Jackson has established a violation of the Fourth Amendment, as Appellees lacked probable cause or arguable probable cause to arrest Jackson for simple battery.

I now turn to the clearly established prong of the qualified immunity inquiry. This Court has repeatedly stated that officers must consider the totality of the circumstances—and particularly, the elements of the offense—in deciding whether to make an arrest. *See, e.g.*, *Carter*, 821 F.3d at 1319–20; *Lee*, 284 F.3d at 1195. And the Georgia statute at issue is clear on its face that contact must be intentional and insulting or provoking to qualify as simple battery. § 16-5-23(a)(1); *see also Moore*, 656 S.E.2d at 799–800. Indeed, as previously noted, Sergeant Cowan knew at the time of Jackson's arrest that the law required an intentional touching as an element for simple battery.

Simple battery as codified in section 16-5-23(a)(1) does not require subjective, criminal intent. Rather, the intent element at issue here is simpler: the touching itself must be intentional. This is not to say that officers will always be able to discern whether a touching was intentional, and of course, officers need not *prove* intent before making an arrest for simple battery. Viewed in the

19-13181    LAGOA, J., Concurring in Part, Dissenting in Part        9

light most favorable to Jackson, the record before this Court—specifically the video evidence and the officers' own words in evaluating Jackson's intent from a reasonable officer's perspective—demonstrates that an objectively reasonable officer would not have believed that Jackson intentionally touched Law. I therefore would reverse the district court's denial of Jackson's Fourth Amendment false arrest claim.

### III.    Retaliatory Arrest Claim

Jackson also argues that Appellees violated the First Amendment by arresting him based on the content of his speech. As the majority notes, at the time of Jackson's arrest, it was the law of this Circuit that the existence of probable cause barred a First Amendment retaliatory arrest claim. *See Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002) ("[T]he existence of probable cause . . . defeats [a] First Amendment [retaliation] claim."), *abrogated by Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018); *Gates*, 884 F.3d at 1297–98. Subsequently, in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), the Supreme Court held that while generally, a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest," there is an exception to "the no-probable-cause requirement . . . when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1724, 1727. Because this exception applies to conduct taking place after *Nieves* was decided, it was not clearly established law in this Circuit at the time of Jackson's arrest. As previously discussed,

10        LAGOA, J., Concurring in Part, Dissenting in Part   19-13181

however, the summary judgment record at issue here does not support a finding of probable cause or arguable probable cause for Jackson's arrest on simple battery.  Because the existence of probable cause or arguable probable cause is lacking, I therefore proceed to the substance of Jackson's § 1983 retaliatory arrest claim.

"To state a § 1983 First Amendment retaliation claim, a plaintiff generally must show: (1) [he] engaged in constitutionally protected speech . . . ; (2) the defendant's retaliatory conduct adversely affected that protected speech . . . ; and (3) a causal connection exists between the defendant's retaliatory conduct and the adverse effect on the plaintiff's speech." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019); *accord Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).  Here, it is undisputed that Jackson's speech in a designated free speech area was protected by the First Amendment, *see Redd v. City of Enter.*, 140 F.3d 1378, 1383 (11th Cir. 1998), and that being placed under arrest had an adverse effect on his speech.  The questions that remain before us to determine are whether Appellees displayed "retaliatory conduct" towards Jackson and whether that retaliatory conduct was the but-for cause of Jackson's arrest.

Appellees repeatedly expressed disdain and animosity for the preachers' religious speech.  Sergeant Cowan told students that there was "very little religion involved" and that "[t]his is not real religion."  He further described Jackson's speech as "an ongoing problem" with the purpose to "inflame the group."  He additionally stated that Jackson's "whole thing is to either to get [the

19-13181   LAGOA, J., Concurring in Part, Dissenting in Part     11

officers] to respond to cause a First Amendment violation or to get somebody to strike him and then sue that person." And, in reporting the arrest to an investigative officer, Sergeant Cowan said, "Crowd went crazy. I think we hit a home run."

As to whether this animosity was the cause of Jackson's arrest, the officers' treatment of Law captured on video provides an instructive comparison. Just a few minutes before Appellees arrested Jackson for simple battery, Jackson informed the officers that Law had yelled directly in Jackson's ear. Jackson later testified that Law shouted so close to Jackson's ear that Jackson "felt [Law's] spit touch him." Jackson further testified that Law chest bumped him at one point during their exchange. Law's actions of repeatedly following Jackson and yelling in his face and ear could qualify as assault or disorderly conduct under Georgia law.[1] Notably, when Officer Dorsey first arrived, he attempted to intervene, noting that it "looked like [Law] was all up in [Jackson's] face," but Sergeant Cowan called him back. The officers also ignored Jackson's question about Law putting his mouth directly on his ear and yelling. Indeed, as captured on video, a student in the background yells at

---

[1] "A person commits the offense of simple assault when he or she . . . [c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." Ga. Code Ann. § 16-5-20(a)(2) (2016). "A person commits the offense of disorderly conduct when such person . . . [a]cts in a violent or tumultuous manner toward another person whereby such person is placed in reasonable fear of the safety of such person's life, limb, or health." Id. § 16-11-39(a)(1).

12      LAGOA, J., Concurring in Part, Dissenting in Part   19-13181

Jackson after Officer Cowan ignored the question that "not even the cops listen to you." In his report to the investigative officer, Sergeant Cowan admitted that he heard Jackson's complaint about Law shouting in his ear and waved it off.

Viewed in the light most favorable to Jackson, as is proper at this stage, Appellees had a disparate reaction to similar levels of aggression from Jackson and Law, and a genuine dispute of material fact exists as to whether Jackson's arrest was motivated by Appellees' animosity toward the content of his speech. I therefore would reverse the district court's dismissal of Jackson's First Amendment retaliatory arrest claim.

★ ★ ★ ★

For the foregoing reasons, I concur with the majority's affirmance of the rejection of Jackson's claims for failure to intervene, racial discrimination, and conspiracy in violation of § 1985(3). But I respectfully dissent as to the majority's affirmance of the denial of Jackson's claims for false arrest under the Fourth Amendment and retaliatory arrest under the First Amendment.